## Staunton.

## Stuart and Others v. Meade and Others.

September 11, 1916.

1. Adverse Possession—*Line Fence—Agreement—Transfer of Title—Notice—Case at Bar.*—Where adjacent land owners build a line fence "on or near the line between them" and by written agreement stipulate that "neither party shall have any advantage of the other by the fence not being on the line, and that when the fence is reset, it shall be put on the true line between the parties, unless otherwise agreed," the alienees of the parties are bound by the agreement whether they have notice of it or not.

2. Adverse Possession—*Privity—Presumption—Notice—Transfer of Title.* Where possession has been taken in privity with another, the true owner has the right to presume that the original character and intent of the possession remain unchanged until something has been done which will bring home to him notice of a disloyal severance of the privity, and a mere transfer of a record title, with no material change in the character of the possession is not alone sufficient for this purpose. A possession which, in its beginning, was consistent with the possession of the true owner will not be rendered adverse by the lapse of any length of time unless there be such a change in the character of the original possession as will charge the true owner with notice thereof.

3. Adverse Possession—*Mistake—Intention.*—Where a person occupies and possesses the land of another, through a misapprehension or mistake as to the boundaries of his land, with no intention to claim as his own that which does not belong to him, but only intends to claim to the true line, wherever it may be, he does not hold adversely, for, in this State, the intention to hold adversely is an indispensable element of adverse possession.

Error to judgments of the Circuit Court of Russell county, in two actions of ejectment. Judgments for the defendant. Plaintiffs severally assign error.

*Reversed.*

On the 2nd day of October, 1871, Elizabeth T. Johnson and Louisa M. Johnson, of the one part, and W. A. Stuart, of the other part, owning adjoining tracts of land, entered into a written agreement, which, literally quoted, was that, "the said parties have lately made a fence on or near the line between them running from Gilbert's line to the corner between said Johnsons and Stuart, a distance of eight or nine hundred panels of fence, now it is agreed that the said fence between the parties is to be treated as a line fence, and that neither party shall have any advantage of the other by the fence not being on the line, and that when the fence is reset, it shall be put on the true line between the parties, unless otherwise agreed."

In the year 1897, Louisa M. Webb, who was formerly Louisa M. Johnson and who had become the sole owner of the tract of land which was affected by the above-recited agreement, conveyed the same to "Emily J. Meade and her three children, Gertrude, Charlie and Tom," these grantees being the daughter and grandchildren, respectively, of the said Louisa M. Webb. This conveyance, after reciting a consideration of love · and affection and certain small sums of money to be paid to specified beneficiaries and certain collateral directions to be complied with by the grantees, described the land generally as "the Isaac Johnson land, being the same land on which the said party of the first part now lives, and includes all the land which she now owns." The grantees took possession accordingly, and have held it ever since.

In 1884 W. A. Stuart conveyed to the Stuart Land and Cattle Company the other and adjoining tract which was the subject of the line fence agreement aforesaid; and, by contracts made, respectively, in

August, 1906, and February, 1907, the said company sold a part of the same to D. C. Stuart and the residue to J. T. Puckett. Subsequently, in the year 1913, the Stuart Land and Cattle Company and heirs of W. A. Stuart assigned to D. C. Stuart and J. T. Puckett all rights and benefits arising under the said line fence agreement. Stuart and Puckett were placed in possession shortly after the contracts of sale were made, but no deeds were executed to them until several years later. In about the year 1909, when the lands sold to Stuart and Puckett were being surveyed to enable the parties properly to describe the premises, it developed that according to the true line the fence which had all along been the visible and physical division was so located as to include within the Johnson boundary something over seven acres of the original Stuart land. A part of this seven acres falls within the lines of the D. C. Stuart purchase and the residue in the Puckett boundary.

The attention of the grantees in the deed from Mrs. Webb was called to this disclosure, but they refused to agree to any change in the location of the fence, and, thereupon, Stuart and Puckett brought their separate actions of ejectment. These two actions were, by agreement, tried together, and there was a verdict and judgment for the defendants. The defense relied upon was their possession.

It is conceded that the true line is as claimed by Stuart and Puckett, and that, until the survey was made in 1909, the location of that line was in fact unknown to the plaintiffs and to the defendants. The plaintiffs appear to have known from about the time of their purchase that the previous owners of the adjourning tracts had not regarded the fence as the true line, and they did not know whether they, or the de-

fendants, would lose land by the survey. The defendants claim, and there is evidence tending to support the claim, notwithstanding the close family relationship between them and their mother and grandmother, Mrs. Webb, that she had never informed them of the line fence agreement, and that they did not know of it. Mrs. Webb's son-in-law, J. H. Meade, the husband of the defendant, Emily J. Meade, looked after and managed the land for Mrs. Webb from the time her husband died in 1879 until she conveyed it to Meade's wife and children in 1897, a period of about 18 years. When she made this conveyance, the defendants simply stepped into the possession of Mrs. Webb, and continued to hold, use and occupy the land substantially as she had done, without anything to indicate any change of attitude with reference to the division line. The defendants, according to what we think a fair interpretation and summary of their testimony, thought the fence was on the line, and for that reason and in that sense claimed the entire enclosure. During the ownership of the Stuart Land and Cattle Company and of these defendants, this fence being in bad repair was practically rebuilt by representatives of the adjoining owners. The sole reason for this was the bad condition of the fence, and there was no purpose or suggestion to reset it, or to define the true line thereby.

The principal assignments of error are, first, that the court erred in instructing the jury, as it did in effect, that the original agreement as to the location of the fence would not influence the rights of the defendants, unless they had actual notice of it; and, second, that the evidence was not sufficient to support the verdicts.

*W. W. Bird* and *J. J. Stuart*, for the plaintiffs in error.

*H. A. Routh*, for the defendants in error.

KELLY, J., after making the foregoing statement, delivered the opinion of the court.

It must be, and as we understand it is, conceded as a legal conclusion from the foregoing facts that, from 1871, the date of the line fence agreement, down to 1897, the date of the conveyance from Louisa M. Webb to Emily J. Meade and her children, including the eighteen years during which Mrs. Meade's husband looked after the farm for Mrs. Webb, her possession of the land now in controversy was consistent with, and not adverse to, the true title. In our opinion the defendants are in no better position in this respect than was their grantor.

Mr. Raleigh Minor, in his work on Real Property, says: "Finally it is to be observed that if the occupant's possession was *begun in privity* with the rightful claimant, a higher degree of notoriety must attach to the possession than would be demanded if there were no such relation between the parties, for the privity is itself an explanation of the possession, and the rightful owner is not bound to seek another, unless notice of the fact of the disloyal *severance of the privity* be brought home to him. Hence, in such case, there must be a clear, positive and continuous disclaimer and disavowal of the title, of the rightful owner, and the assertion of an adverse right brought home to the adverse claimant. The possession must have become tortious and unlawful by the disloyal acts of the party in possession, so open, notorious and continued as to show

fully and clearly the *changed character of his possession* and *notice* thereof to the rightful claimant." 2 Min. Real Prop., sec. 1033. *Hulvey* v. *Hulvey*, 92 Va. 182, 186, 23 S. E. 233; *Thompson* v. *Camper*, 106 Va. 315, 317, 55 S. E. 674.

It is contended by counsel for the defendants, and that contention was sustained by the trial court in its instructions to the jury, that their rights could not be affected in any way by the line fence agreement, unless they had actual notice of it. This view ignores the right of the true owner to presume that the original character and intent of a possession begun in privity remains unchanged until something has been done which will bring home to him notice "of the disloyal severance of privity." A mere transfer of a record title, with no material change in the character of the possession is not alone sufficient to do this, and certainly not where, as in this case, the conveyance is made to a daughter whose husband has for 18 years been the active representative of a possession which began and continued up to the date of the conveyance in privity with the true title. The theory contended for by the defendants and accepted by the circuit court, places the burden on the wrong shoulders and requires the true owner to presume that a naked possession, assumed under the circumstances existing in this case, is adverse and wrongful. The presumption of law is just the reverse. The great weight of authority is to the effect that mere possession will be presumed to be in subordination to the title of the true owner, that every presumption should be made in favor of such title, and that a possession which in its beginning was consistent with the possession of the true owner will not be rendered adverse by the lapse of any length of time unless there be such a change in

the character of the original possession as will charge
the true owner with notice. 1 Cyc. 1145; 1 C. J. 264.

"The presumption to which we refer is one incor-
porated in many of the statutes of limitation, and which
we think is generally implied, whether stated in direct
terms or not, and is to the effect that possession is
always presumed to be held in subordination to the
legal title. By reason of this presumption, the mere
holding of the lands of another, however long contin-
ued, is not sufficient evidence of title by prescription,
but must be aided by other testimony, from which the
inference may reasonably be drawn that such posses-
sion was maintained in hostility to the title of the true
owner. The presumption ought to apply with special
force when it appears probable that possession of lands
adjacent to a boundary line was taken through ig-
norance or inadvertence, and maintained without
thought of disseising the owner." *Finch* v. *Ullman*,
24 Am. St. Rep., note pp. 389-390.

The only case to which counsel on either side have
cited us, and the only one which we have found, speci-
fically deciding the question of notice arising here
is the case of *Irvine* ·v. *Adler*, 44 Cal. 559. In that
case O'Connor and Wainright bought adjoining lots
which they sebsequently sold. Before making sale,
they "entered upon their respective tracts, and agreed
to measure off with a tape line their respective lots,
put up temporary fences, and that, when the true
lines should be ascertained, each should have his land
according to the true lines; and they accordingly
measured the lots with a tape line, and each entered
upon, and they and their grantees have since occupied
the parcels of land according to the measurements
thus made. The grantees of O'Connor had no knowl-
edge of the agreement in respect to the measurement

of the lots.   The true measurement shows that a narrow strip of the land conveyed to Wainright is included within the lines of the O'Connor lot as run by the 'tape line measurements.' "   The court in that case, after stating the facts here pertinent as set out above, said further:   "In respect to the defense of adverse possession, it is sufficient to say that a possession commenced as in this case is not adverse and does not become so until there is a distinct repudiation of the agreement under which the possession was taken.   The grantees of O'Connor having simply succeeded him in the possession of that to which they acquired no title by their deeds, occupy no better position than he did."

There is another aspect of this case which, by reason of the facts as recited, is more or less related to and blended with the one already discussed, and which seems to us fatal to the defendants.   The principle underlying the view to which we now advert is established as the law in this State, and is supported by the apparent weight of authority elsewhere.

It is stated by Judge Buchanan in *Schaubuch* v. *Dillemuth,* 108 Va. at p. 89, 60 S. E. 746, 15 Ann. Cas. 825, as follows:   "If the fence was placed where it is by the defendant, upon the belief that the boundary west of the fence, in the possession of his grantee and those who claim under him, contained fifty acres, when in fact it only contained thirty-three acres, it was a mistake, and the defendant's possession of the seventeen acres on the east side of the fence would not be adverse, unless he intended to claim as his own the land east of the fence, even though the fence was not upon the true line.

"Upon this question the cases are not in harmony, but the great weight of authority is in favor of the

view, that where a person occupies and possesses the land of another, through a misapprehension or mistake as to the boundaries of his land, with no intention to claim as his own that which does not belong to him, but only intends to claim to the true line, wherever it may be, he does not hold adversely.  See 1 Cyc. 1036-1038 and cases cited in note 96;  Warville on Ejectment, secs. 440, 441;  Newell on Ejectment.

"The reason why such an occupancy and possession could not be adverse with us is  because in this State intention to hold adversely is an indispensable element of adversary possession (see *Clarke* v. *McClure*, 10 Gratt. (51 Va.) 305, 310; *Early* v. *Garland, supra,* [13 Gratt. (54 Va.) 1]; *Haney* v. *Breeden*, 100 Va. 781, 784,  42 S. E. 916), and it is wanting where the occupant does not intend to claim the fence as his line unless it be the true line."

In that case, which was an action of ejectment, the plaintiff, Dillemuth, claimed title under a deed which the defendant had made to his father, Henry Schaubuch, and under which the plaintiff showed a good paper title to the land in controversy.  It appeared from the evidence that the defendant, Schaubuch, had been in possession of the disputed land for more than the statutory period, but it did not appear (as it does in the instant case) when or how his possession commenced.  Schaubuch's deed to his father, under which Dillemuth claimed, conveyed fifty acres of a larger tract owned by Schaubuch, but the dividing fence, for some reason not explained in the evidence, was not placed on the true line and only included in the father's boundary thirty-three acres.  After discussing the abstract principles of law applicable to the case, Judge Buchanan, in sustaining the judgment of the lower court in favor of the plaintiff, on a demurrer

to the evidence by defendant, said further: "The evidence, considered upon the demurrer to it, manifestly does not sustain the defendant's claim of adversary possession. It does appear that he had exclusive possession of the land in controversy for more than fifteen years, perhaps for twenty-five or thirty years; but it does not appear that he held it under color of title or claim of right. If he held it as the grantee of his father, he held, not adversely, but in subserviency to the grantee, as there is no evidence that he ever disclaimed that relation, and asserted an adverse right, which was brought to the knowledge of his grantee or those claiming under him. If he was holding the land under the mistaken belief that the fence between the thirty-three acres and the land in controversy was the line, the evidence not only fails to show that he intended to claim and hold all the land east of the fence, whether or not it was upon the true line between his land and that he had conveyed to his father, but it tends strongly to show that he did not occupy the land with the intention of clainimg or holding to the fence unless that was upon the true line." See also 2 Min. Real Prop., sec. 1036, p. 1114; Graves' Notes on Real Prop., sec. 139, and note; *Davis* v. *Owen*, 107 Va. 283, 289, 58 S. E. 581, 13 L. R. A. (N. S.) 728; *Clinchfield Coal Co.* v. *Viers*, 111 Va. 261, 68 S. E. 976; Note to *Schaubuch* v. *Dillemuth*, 15 Ann. Cases 827, and subsequent note in Ann. Cases 1912-A, p. 450, classing the Virginia decisions with the majority rule.

For the reasons stated, we are of opinion that the judgments complained of must be reversed, the verdicts of the jury set aside, and the causes remanded for new trials to be had not in conflict with the views herein expressed.

*Reversed.*