E. P. JOHNSON and PEARL J. JOHNSON, husband and wife,

*Plaintiffs and Respondents,*

vs.

JOHN SZUMOWICZ,

*Defendant and Appellant.*

(No. 2348; April 22nd, 1947; 179 Pac. (2d) 1012.)

212

For the plaintiffs and respondents there was a brief by Rodney M. Guthrie of Newcastle, Wyoming.

For the defendant and appellant there was a brief by Preston T. McAvoy of Newcastle, Wyoming.

OPINION

RINER, Chief Justice.

The record in this case, here by direct appeal, brings in question the propriety of a judgment of the District Court of Weston County. The plaintiffs, E. P. Johnson and Pearl J. Johnson, his wife, respondents in this court, brought an action against John Szumowicz as defendant and now the appellant, for the recovery of certain lands in the county above mentioned, based on a claim of ownership thereof by purchase and warranty deed therefor. The defendant asserted ownership in himself of a portion of the lands thus sued for by the plaintiffs, his claim being predicated on an alleged adverse possession thereof for the statutory period of ten years. These parties may usually be conveniently referred to hereinafter as they were designated in the District Court.

In the year 1909 one Thad (or Ted) Bird appears to have owned certain lands in Weston County Wyoming which were originally patented to him or members of his family by the United States of America, said lands being theretofore public lands of the nation. These lands here described as:

"Northwest quarter of the Southwest quarter (NW¼-SW¼) of Section 25; North half of the Southeast quarter (N½SE¼), Southeast quarter of the Northeast quarter (SE¼NE¼) Southeast quarter of the Southeast quarter (SE¼SE¼) of Section twenty-six (26) and the North half of the Northeast quarter (N½NE¼), Northeast quarter of the Northwest quarter (NE¼NW¼), Southeast quarter of the Northeast quarter (SE¼NE¼) of Section thirty-five (35) all in Township forty-seven (47) North of Range Sixty-one (61) West of the 6th P. M."

At that time the official corners of the legal subdivisions of these lands were marked and known through the

medium of the United States government survey thereof which had been made previously in the months of May, June, and October, 1881.

Also in the year 1909 one Miles C. Cullum had received a patent from the United States of America to lands described as:

"Northeast quarter of the Northeast quarter (NE¼-NE¼) of Section twenty-six (26); and the North half of the Northwest quarter (N½NW¼) and the southwest quarter of the Northwest quarter (SW¼NW¼) of Section twenty-five (25) in Township forty-seven (47) north of Range sixty-one (61) west of the Sixth Principal Meridian, Wyoming, containing one hundred sixty acres according to the official plat of the survey."

It will be observed that the Cullum and Bird lands were adjoining as regards two forty-acre subdivisions in each tract. The Northeast quarter of the Northeast quarter of section twenty-six owned by Cullum adjoined on its southerly boundary the northerly boundary of the Southeast quarter of the Northeast quarter of section twenty-six aforesaid owned by Bird; and the Southwest quarter of the Northwest quarter of section twenty-five owned by Cullum adjoined on its westerly boundary the easterly boundary of the Southeast quarter of the Northeast quarter of section twenty-six owned by Bird as stated above and adjoined on its southerly boundary the northerly boundary of the Northwest quarter of the Southwest quarter of section twenty-five also owned by him.

It appears that the true line separating these adjoining lands to some extent at least passed over quite rocky ground where fencing was difficult if not impossible. There was a road in existence at this time which used some of the Bird land for its right of way. It was understood between these parties that certain fences might be constructed, not as boundary fences at all, but

simply for the convenience of these land owners so that the road might be used and Bird would not have to fence out a small portion of the land east of the road and it made a better road that way, as one of the witnesses states.

The following excerpts from the testimony of Mr. Cullum are pertinent at this point:

"Q. With respect to where your lands joined Mr. Bird's land, you put that fence in there between the two places?

"A. I did.

"Q. You enclosed a portion of Mr. Bird's land?

"A. I did.

"Q. Did you have any agreement about that?

"A. Nothing in particular only he told me that I could fence that part of the ground if I wanted to. He wanted the road up through there and put it that way. That made a better road that way and he fenced straight north to the section line and after he fenced he told me to."

* * * * *

"Q. As I understand it you had agreed on where the proper lines were.

"Yes, we had no dispute. He gave me leave to fence this and I did.

"Q. Did you claim it?

"A. No I didn't claim it. I farmed it and that was the only way I claimed it. I didn't claim the land because I knew it wasn't mine."

* * * * *

"Q. You and Mr. Bird had enclosed these premises for convenience and there was no attempt to put those fences on the line?

"A. No.

"Q. And you didn't claim any of his land that was enclosed in your pasture.

"A. No.

* * * * *

"Q. And Mr. Bird left some land north of this fence for you to use?

"A. He did.

"Q. You in turn used some of his that was east of the road?

"A. Yes, I did."

* * * * *

"Q. As I understand your arrangement with Mr. Bird was one of convenience and you didn't claim his land.

"A. No, I didn't.

"Q. Did he ever assert any claim to your land?

"A. No, he didn't."

And from Mr. Bird's testimony under commission and written interrogatories we take the following:

"Q. Are you the same Thad Bird who in the fall of 1943 sold the premises mentioned in question four to E. P. Johnson and Pearl J. Johnson?

"A. Yes.

"Q. State what if any fences you erected on the lands you formerly owned.

"A. I put a fence along the road separating my cultivated field from the road, but the fence was not put on any boundary line.

"Q. If the answer to the above question is that you did erect fences on these lands state whether or not such fences were erected on section or survey lines or were intended to be on such lines and if not why were they placed where they were?

"A. The fence was not intended to be placed on any section or survey line. The fence was placed where it was solely for convenience."

* * * * *

"Q. State whether any county or used road was upon or crossed any part of these premises and approximately where it was located.

"A. There was a used road, shown on the attached sketch and marked 'private road'.

"Q. If you know will you tell the Court why this road was established on its location.

"A. It was the handiest location and gave access to the State Highway.

"Q. Whose land did this road cross and was it the division line of your property?

"A. The road crossed my land and was not the division line of the property.

"Q. Did your land extend east of this road?

"A. Yes."

"Q. Will you state fully your reasons for the erection of the fences on your lands and why they were placed where they were.

"A. The fence was placed where it was solely for convenience."

This testimony of these original owners of these two tracts of land stands in the record undisputed.

In 1943 the plaintiffs purchased the Bird tract as above described from Thad Bird and received a warranty deed from him dated October 22 and recorded December 27 of that year. Meanwhile and nearly 20 years before Bird had left the land and moved to Canada. The plaintiff E. P. Johnson, it appears had leased this property from Bird since the year 1936 using it for cattle grazing and also for farming.

The Cullum tract aforesaid passed through sundry ownerships by mortgage foreclosures and deeds. In every such instance, the descriptions of the 160 acres of land was confined to legal subdivisions and nothing appears in any conveyance indicating that there was any boundary between the above described two tracts of land other than the stated section and township lines. In this connection it may be noted that though several of the subsequent owners of the Cullum lands gave their testimony on the trial of this case, none of them stated that the fences located as above described

were ever intended or regarded as boundary fences between the tracts originally owned by Bird and Cullum or that these subsequent owners following Cullum claimed more land than the 160 acres indicated in the written conveyances they received. The outstanding and significant fact as shown by the record as we read it is that the land now in dispute was used and cultivated by the successors in interest of Cullum including the defendant, just as Cullum did, without any clear or positive disavowal of title in Bird or the plaintiffs or an assertion of adverse right brought home to them by such successors in interest. The first intimation that was made of a claim hostile to the Bird-Johnson title to these lands was in May, 1945 when the defendant tore down the posts attempted to be placed on the boundary line undertaken to be established by the County Surveyor of Weston County at plaintiff's request as hereinafter recited.

It appears that the defendant leased the aforesaid 160 acre tract in the year 1932. At that time one Burton F. Peek was the record owner thereof and had been such since February 28, 1922, the date of the conveyance by his predecessors in interest, Winfield Franklin and wife, to him. The terms and description of the land included in the lease or leases to defendant do not appear in the record. The defendant seems to have farmed the 160 acre tract until he purchased it October 31, 1942, the warranty deed being recorded November 30, 1942, from Burton F. Peek and wife; and it would also seem that he farmed and used the land outside that tract bounded by the fences aforesaid and in dispute, though how much and exactly where this was done is not altogether clear. The warranty deed last mentioned described the 160 acre tract thus conveyed merely by eighty and forty acre subdivisions as they were originally patented to Cullum as hereinbefore stated. There appears no suggestion at all that

more land than the 160 acres included therein was undertaken to be transferred to the defendant. The fences aforesaid are described in the record by testimony and shown by maps received in evidence as not running "in a straight direction, more or less 'joggy'." The defendant during the period he leased the Peek property appears not to have made any claim to anyone that he was asserting that the land was his or making claim to it adversely to Mr. Bird or to the plaintiffs or either of them. Nothing has been drawn to our attention which indicates that the owners of the Miles C. Cullum land who took title to that property subsequent to Mr. Cullum did not know of the arrangement as to these fences existing between Bird and Cullum. Indeed the fact that the conveyance from Cullum to his grantee and all subsequent transfers referred only to the legal subdivisions established by the official land survey of the United States Government would inferentially seem to indicate they did know of it. At least no testimony is referred to indicating that they did not know of that arrangement. The defendant himself stated that he only purchased 160 acres of land and that he paid taxes on that amount of real estate. He now claims, as we understand the record, 208.48 acres.

The first suggestion that the defendant claimed the land within and bounded by these fences as his own appears to have come only to the plaintiffs when the latter employed the County Surveyor of Weston County to establish the true boundary lines between these properties according to the official and original Government Survey. This officer undertook to do so and when the plaintiffs endeavored to place fencing along the line thus run the defendant removed it, tearing out the posts placed by the plaintiffs. This did not occur until in May, 1945. In this connection may be considered the testimony of Mr. Bird as follows:

"Q. After you left these lands and moved to Canada and up to the time you sold them were you at any time advised or did you know that John Szumowicz, Burton Peek, Winfield Franklin or the Thoeiming Commercial Company or any person claiming under them were occupying a part of your lands or claiming the title to them adversely to you?

"A. No.

"Q. Did you ever acquiesce, consent or agree with John Szumowicz or any of his predecessors in interest or any one that they might go upon your lands or erect valuable improvements thereon?

"A. No.

"Q. Did you know or were you advised that any person or persons was either occupying or erecting improvements on these lands?

"A. No."

Relative to this surveying work done at plaintiff's instance, it may be observed that the surveyor testified that he found several of the original official survey corner monuments missing, notably the Northeast corner of Section 26, Township 47, Range 61, West of the 6th P. M., and the Southeast corner of that section. He did, however, establish a corner at the latter point but none at the Northeast corner of the mentioned section. In answer to this question propounded by the Court:

"Mr. Robinson, with respect to the northeast corner of Section Twenty-six, about which you have testified, would the establishment of that northeast corner be necessary to establish the lines between the lands here in controversy in this lawsuit?",

the County Surveyor testified: "According to the Manual, it would". The officer's reply had reference to the "Manual of Instructions for the Survey of the Public Lands of the United States" relative to the "Restoration of Lost Corners" approved by the Commissioner of the General Land Office and the Secretary of the De-

partment of Interior of the United States which Manual was received in evidence and was before the District Court in this case.

The cause was tried to the court without a jury and judgment rendered wherein it was found that the plaintiffs are and were at the time of filing their petition, the owners in fee of and entitled to the lands as described above and as claimed by them; that the defendant was not a trespasser against the rights of the plaintiffs; that he is the owner in fee and in the possession of the lands as described above and as conveyed to him as set forth in the warranty deed dated October 31, 1942 and was such owner at the time and prior to filing his pleadings herein; that plaintiffs are not trespassers against the rights of the defendant; that "the Plaintiffs have failed to establish, or cause to be established, duly by survey on the ground and premises, the boundaries of the lands and premises between the Plaintiffs and the Defendant. That it is impossible therefrom, from the proofs herein adduced, to determine the boundaries in controversy herein between the Southeast Quarter of the Northeast Quarter (SE¼-NE¼) of Section Twenty-six (26) and the Northwest Quarter of the Southwest Quarter (NW¼SW¼) of Section Twenty-five (25), lands belonging to the plaintiffs, and the Northeast Quarter of the Northeast Quarter (NE¼NE¼) of Section Twenty-six (26) and the Southwest Quarter of the Northwest Quarter (SW¼-NW¼) of Section Twenty-five (25), lands belonging to the Defendant, all of said lands being in Township Forty-seven (47) North, Range Sixty-one (61) West of the Sixth Principal Meridian."; that "it appears conclusively from the evidence adduced on trial that Thad Bird, the original patentee of the lands above described as now owned by the Plaintiffs, and Miles C. Cullum, the original patentee of the lands above described now owned by the Defendant, placed the original fence lines

on the premises above described as a convenience, well knowing at the time the said original fence was not upon the true boundary line between lands owned by the original patentees, Thad Bird and Miles C. Cullum;" that "said original fence line, as originally placed upon the ground, is in such a position as would tend to put a person viewing the same upon inquiry as to where the true boundary line really was, and that therefore the Court finds that said original fence as originally placed upon the lands by Miles C. Cullum and Thad Bird and now present upon the premises is not the true boundary line between the lands owned by the Plaintiffs and Defendant;" that "the fence line placed upon the premises by the Plaintiffs during the summer of 1945, according to the survey made by Plaintiffs, is not a fence line upon the true boundary line between the lands owned by the Plaintiffs and Defendant". The final finding of the court incorporated a bit of advice for the parties involved to the effect that in order to establish the true boundary line between the lands owned by plaintiffs and those owned by the defendant as described above, it would be necessary for a survey to be made in accord with the "Manual of Instructions" hereinbefore mentioned as in evidence in the case.

Judgment was given pursuant to these findings and awarding to plaintiffs "the exclusive title and possession of the lands of the Plaintiffs, as described in said pleadings, and the Defendant is hereby awarded the exclusive title and possession of his lands as described in said pleadings"; that "the Plaintiffs herein have not been damaged in any sum or amount whatsoever by the Defendant herein"; and that "The monuments and corners have not been established according to law so as to define or cause to be defined upon the lands and premises the boundaries in accordance with survey, and said survey is not in conformity to law". The parties were ordered to pay their own costs.

The contention of the defendant is that there is to be determined here only the "right and title of the defendant as against the plaintiffs to have and hold the lands embraced within the fences" originally established about those lands by virtue of his alleged "adverse possession, the acquiescence and the recognition thereof by the plaintiffs and their predecessors in interest extending over the statutory period of time allotted by law within which to assert a right".

Under the record as we have briefly reviewed it above, it must be quite clear that the "lands embraced within the fences" and now claimed by adverse possession on the part of the defendant were fenced, used, and cultivated by Miles C. Cullum, the original source of defendant's title and possession merely by permission of Thad Bird and not under a claim of ownership by the former against the latter. The fences were located as we have seen not as boundary lines between the two tracts of land claimed by these parties but merely as fences of "convenience". Neither claimed to own lands other than those described by eighty or forty acres pieces, stating section, township, and range, i. e., in accord with the governmental and official survey of the public lands of the United States. When they afterwards came to convey these lands all parties connected with the respective title to all the lands involved employed only the descriptions used by the public lands survey system.

In 2 C. J., p. 124, Section 210 upon the authority of a wealth of cited cases it is said:

"where the possession of the claimant was in its inception taken with the permission of the owner and in subordination to his title, it cannot become adverse without a distinct and open disavowal of the title of the owner, brought home to the owner."

And the same text (2 C. J. 134, section 230) also with abundant supporting decisions cited, says that:

"Nevertheless, the theory on which adverse possession becomes a perfect title is that the true owner has by his own fault failed to assert his right against the hostile holding, and where possession is originally taken and held under the true owner, a clear, positive, and continued disclaimer and disavowal of title, and an assertion of an adverse right brought home to the true owner, are indispensable before any foundation can be laid for the operation of the statute of limitations. Without this the length of the occupancy is immaterial and does not affect the title, and possession for the full period of limitation must have elapsed after such repudiation before title based thereon can be acquired. If the rule were otherwise the greatest injustice might be done."

In accord with these statements of the law, the supreme judicial court of Massachusetts in Burrell vs. Burrell, 11 Mass. 294, 298 pointed out that:

"But where the parties have agreed upon a fence variant from the line, avowedly for convenience, and still have continued to claim according to the true line, neither party acquires a title, or even a right of possession, against the other, merely on account of the fence."

This court in State vs. Vanderkoppel et al., 45 Wyo. 432, 438, 439, 19 Pac. 2d 955 considering a factual and legal situation rather analogous in many respects to that now at bar has declared that:

"The state, however, claims that it has brought itself within the rule of Carstensen v. Brown, 32 Wyo. 491, 236 Pac. 517, in that the boundary between the lands of plaintiff and defendants was established by recognition and acquiescence for a period of over ten years in the line as shown by the fence constructed by John F. Cates in 1907. But there is no evidence in the record to bring the case within the rule of the cited case. The existence of a division fence does not alone show the requisite facts, for it may be kept up only for convenience of the parties. And *the acquiescence must be by both parties in order to make it binding,* and this involves notice or knowledge of the claim of the other party. Carstensen v. Brown, supra. In the case at bar

the predecessors in interest of the state made no claim except one to the true boundary, not to the line of the fence constructed by Cates, for that fence, according to their testimony, was simply one for convenience." (Italics supplied.)

Similarly the author of the elaborate note in 97 A. L. R. p. 88, Subdivision "X" entitled "Establishment of Line Tentatively or for Convenience" says:

"There is a substantial agreement in the decided cases that a mere tentative line, made for convenience to await the location of the true line at some future time, or a line established for the convenience of the parties, the position of the true line being recognized, furnishes no basis for adverse possession."

The quoted statement is upheld by the citation of numerous cases from many jurisdictions throughout the nation.

2 C. J. S. 625, Section 80 announces the rule that:

"The permissive character of an original entry extends to the possession of those claiming under the original entrant."

In Cox vs. Godec 107 Colo. 69, 108 Pac. 2d 876 there was presented a situation also in many respects like that at bar. The facts as stated by the court were these:

"One Edward Blaser, in 1916, was the fee owner of certain lands described by metes and bounds, being a part of the northwest quarter of the southwest quarter of section 11, township 14 south, range 67 west, in El Paso county. Some time in that year he conveyed to one John Sikola a portion of the land so described. During the time Sikola was the owner of said land Blaser permitted him to extend his fence twenty feet easterly to the alley, thus taking in about .11 of an acre, the land here in controversy, title to which remained in Blaser, thereby placing his land and the twenty-foot strip belonging to Blaser within one enclosure. In a conversation with Elizabeth Sikola, wife of John Sikola, during the time he was in possession of the twenty-foot strip, Blaser told her that after the payments for

the land sold to Sikola had been completed he would give her the twenty-foot strip in question, and 'that papers would be fixed up to carry this out later'. Before all payments were made—$50 still being due—John Sikola sold the property to defendant. Defendant received a deed for the property conveyed by Blaser to Sikola from the latter about June 1, 1907, using the same description by metes and bounds as that contained in the Blaser-Sikola deed, which did not include the twenty-foot strip. Blaser died in 1933, but shortly prior thereto had conveyed to his wife, Anna Blaser, together with other lands, this twenty-foot strip, and it is not disputed that the Blasers always paid the taxes on the land. At the time defendant bought the land from Sikola he obtained no abstract and had no survey made, but took Sikola's word that all of the fenced land, which included the twenty-foot strip, was the tract he had purchased. Blaser, living near by, made no objections to Sikola's use of the twenty-foot strip. The first change in the improvements on this strip, title to which is in dispute, was in 1921, when Godec erected a garage thereon, and thereafter built chicken coops and pens on the tract. He did not know that he was not paying the taxes on the land in controversy, and thought the twenty-foot plot was included in his deed. He testified at the time that if he had not entertained this belief he would not have erected buildings on the strip. His intention was to claim only what he thought he had purchased, and he always felt certain that the land in the enclosure belonged to him until the year before the trial, which was October 27, 1938. November 26, 1937, Anna Blaser conveyed the twenty-foot strip to plaintiff, who had some knowledge of the circumstances under which defendant was claiming possession before the property was conveyed to him.

"That Sikola's possession of the twenty-foot strip was permissive, and not antagonistic to Blaser, seems to be conceded. Counsel for defendant states—and this is not disputed—that the trial court was of the opinion that it was required to determine whether the permissive entry of Sikola was necessarily terminated by the subsequent entry of defendant. That this entry by Godec was sufficient to originate adverse possession is urged in his brief and seems to be the premise upon

which the trial court found for defendant. That it did so also is inferred from the fact that it ignored the first act of defendant which might be considered as hostile to Blaser's title, which was the building of a garage on the strip in question in 1921. The evidence does not sustain any parol gift."

Upon these facts the trial court gave judgment for the defendant, Godec in an unlawful detainer action brought against him by Cox.

The plaintiff below who was the appellant in the reviewing court, contended that the court committed error in upholding the defendant's claim of title based on adverse possession since his possession was rested upon a permissive entry granted by the plaintiff's predecessors in title and that a permissive grant could not "ripen into an adverse ownership".

Reversing the judgment below, the appellate court said in part:

"A statement of the law applicable to possession after permissive entry appears in 2 C. J. S., Adverse Possession, § 216, subd. d, p. 823, which reads as follows: 'Where the original entry on land was amicable or in subordination to the rights of the true owner, as where it was by permission or license from the true owner, or by virtue of a mistake as to the boundary line, the possessor intending to claim only to the true line, possession will, in the absence of an explicit disclaimer of subservience, be presumed to continue as it began; and there is no presumption arising from mere possession, however long it may continue, that the holding is adverse. The presumption may, however, be overcome by evidence that the holding is adverse of which the true owner had notice or knowledge'."

"We do not agree with the evident holding of the trial court that when defendant, under a conveyance from Sikola, entered upon the property here in controversy, his possession necessarily was hostile and antagonistic to the holder of the legal title to the twenty-foot strip, and we hold, under the presented circumstances, that it was error to find the issues in favor of defendant.

Where, as here, the entry upon land is permissive, only if and when it is shown by satisfactory evidence that possession of the entrant became antagonistic and hostile, with notice thereof to the owner or his successor, and thereafter such possession continues for the period required by law, can the defense of adverse possession prevail."

The case of Morse et al. vs. Churchill 41 Vermont 649 was an action of trespass quare clausum fregit. The original owners of the adjoining property, Stanley and Noyes mutually agreed to build a slash fence in 1828 wherever they could build it the cheapest and easiest not trying to build it on the true line between the respective tracts of land but wherever they could do it most conveniently. Ever since the building of the fence, the defendant and his grantors were in the peaceable and exclusive possession of all the land on the north side of said fence and no one ever disturbed them in that possession until in 1867 when the pine tree was cut which was the cause of the law suit. The defendants had pastured the land and had cut and drawn away timber and wood from it. The tree cut by defendant's servants and at his instance for which plaintiffs claimed recovery, stood on the north side of the slash fence but about 20 or 25 feet south of the true line. All these facts were found by a referee's report and the trial resulted in a judgment for the plaintiff. Affirming this judgment, the reviewing court discussed the matter thus:

"It appears that when Gilbert Noyes owned the land now owned by the plaintiffs, and Stanley owned the land now owned by the defendant, the straight line 130 rods, marked on the plan and found by the referee to be the true line, was a line well marked with well established permanent boundaries and corners, well known to and recognized by Noyes and Stanley while they owned their respective parcels. In addition to this, on the eastern portion of this division line they had a rail fence on this straight line, extending westerly sixty

or seventy rods, built previous to 1828, and which still remains there. When Noyes and Stanley, in 1828, the then adjoining proprietors, built the slash fence, commencing at the west end of the rail fence and extending on westerly up the hill over the rocks and ledges, running it zig-zag for convenience wherever they could build it the cheapest and easiest, knowing that it did not follow the line, no *adverse* occupancy was thereby commenced beyond the line which was then mutually recognized as the true division line. Nor would any such possession commence, which would be available to the defendant to gain title to the land up to the slash fence, until the defendant or his grantors claimed to that fence. The referee does not find that the possession relied on by the defendant was under any such claim. It is true that, as a general rule, when one is shown to have been in possession for fifteen years, apparently as owner, and such possession is not explained or otherwise accounted for, it will be presumed to have been adverse. But this presumption may be rebutted by proof that the possession in its origin was not adverse, but permissive; and sometimes the condition of the property and the circumstances accompanying the occupancy itself will rebut the presumption that it was adverse or under a claim of right. In this case, both concur to rebut this presumption. The most favorable view for the defendant that can reasonably be taken of the case is, to inquire whether the occupancy by the defendant and those under whom he claims, can be inferred, from the facts reported, to have been under a claim of title to the strip of land between the true line and the slash fence of the place in question. So far as the occupancy of Stanley is concerned, who assisted in building the slash fence under the circumstances reported, clearly no such inference could be drawn. The grantees of Stanley, and subsequent occupants, may not have been informed of the understanding under which that slash fence was built, but there was much in the appearances to indicate that the zig-zag slash fence was not the true line in all places, or recognized and claimed by the adjoining proprietors to be such."

So in Stuart et al. vs. Meade et al. 119 Va. 753, 89 S. E. 866 it appeared that adjacent land owners, Elizabeth T. Johnson and Louisa M. Johnson of the one part

and W. A. Stuart of the other part entered into a written agreement in October, 1871 which stated that:

"the said parties have lately made a fence on or near the line between them running from Gilbert's line to the corner between said Johnson and Stuart, a distance of eight or nine hundred panels of fence, now it is agreed that the said fence between the parties is to be treated as a line fence, and that neither party shall have any advantage of the other by the fence not being on the line, and that when the fence is reset, it shall be put on the true line between the parties, unless otherwise agreed."

Both the above mentioned owners conveyed their lands to other parties. In 1909 when a survey was made to enable the subsequent grantees of Stuart to describe properly the premises, it developed that some seven acres of land fell within the correct land boundary of the original Johnson property which was in fact a part of the original Stuart tract. When the attention of the grantees of the Johnson lands who had held them since 1897, the date of their deed, was called to the situation, they refused to agree to any change and the other grantees from Stuart brought ejectment actions. There was a verdict and judgment for the defendants. It was assigned as error that the trial court instructed the jury in effect that the original agreement regarding the fence location as recited above "would not influence the rights of the defendants unless they had actual notice of it" and also that the verdicts were insufficiently supported by the evidence.

In reversing the judgment thus given the supreme court of appeals of Virginia said this.

"It must be, and as we understand it is, conceded as a legal conclusion from the foregoing facts that, from 1871, the date of the line fence agreement, down to 1897, the date of the conveyance from Louisa M. Webb to Emily J. Meade and her children, including the eighteen years during which Mrs. Meade's husband

looked after the farm for Mrs. Webb, her possession of the land now in controversy was consistent with, and not adverse to, the true title. In our opinion the defendants are in no better position in this respect than was their grantor.

"Mr. Raleigh Minor, in his work on Real Property, says: 'Finally it is to be observed that if the occupant's possession was *begun in privity* with the rightful claimant, a higher degree of notoriety must attach to the possession than would be demanded if there were no such relation between the parties, for the privity is itself an explanation of the possession, and the rightful owner is not bound to seek another, unless notice of the fact of the disloyal *severance of the privity* be brought home to him. Hence, in such case, there must be a clear, positive and continuous disclaimer and disavowal of the title, of the rightful owner, and the assertion of an adverse right brought home to the adverse claimant. The possession must have become tortious and unlawful by the disloyal acts of the party in possession, so open, notorious and continued as to show fully and clearly the *changed character* of his possession and *notice* thereof to the rightful claimant'. 2 Min. Real Prop., sec. 1033. *Hulvey v. Hulvey*, 92 Va. 182, 186, 23 S. E. 233; *Thompson v. Camper*, 106 Va. 315, 317, 55 S. E. 674.

"It is contended by counsel for the defendants, and that contention was sustained by the trial court in its instructions to the jury, that their rights could not be affected in any way by the line fence agreement, unless they had actual notice of it. This view ignores the right of the true owner to presume that the original character and intent of a possession begun in privity remains unchanged until something has been done which will bring home to him notice 'of the disloyal severance of privity'. A mere transfer of a record title, with no material change in the character of the possession is not alone sufficient to do this, * * *".

See also Ford vs. Bradford 212 Ala. 515, 103 So. 549; Burnell, Adm'r. vs. Maloney 39 Vermont 579; Dial et al. vs. Armstrong et al. 195 Ark. 621, 113 S. W. 2d 503; Superior Oil Co. vs. Harsh et al., 126 Fed. 2d 572.

As before observed, the successors in interest to Miles C. Cullum continued to use and cultivate the lands outside of the public land survey boundaries of the 160 acres to which they obtained title in the same manner as had Cullum. Neither they nor the defendant did anything to warn Bird or the plaintiffs that they were claiming to own the additional acreage until the defendant asserted such a claim to plaintiff E. P. Johnson and removed the fences the latter had endeavored to erect. How was Johnson to know before that time that the arrangement Bird and Cullum made originally was to be regarded as no longer operative? There should have been, as there ultimately was in May, 1945 and of course at a time when the ten years statute of limitations could not aid, some positive, unequivocal act or statement to make it clear to Bird and the plaintiffs that the land within the fences and outside of the 160 acre tract conveyed to the defendant was being held adversely to them. Obviously only using the premises as Cullum had done in dealing with this land did not accomplish the purpose. Then too, the fences on the lands were in such a disorderly state that everyone, as the District Court found, dealing with the properties, was put on notice that these fences as land boundaries were utterly misleading and erroneous. They stood as warning monuments of the true situation. Additionally, as heretofore suggested, for aught that appears in this record, the defendant and his predecessors in interest since the Cullum ownership knew that the use and cultivation of the lands excluded from their deeds was permissive only. Being so, the rules governing such use and cultivation as hereinbefore shown by the authorities cited should be applicable.

Under the proofs submitted to it, we are unable to see that the District Court of Weston County could have

acted otherwise than it did and its judgment is accordingly affirmed.

*Affirmed.*

BLUME, J., and KIMBALL, J., concur.