**CITY OF ANCHORAGE, Appellant,**

v.

**Buell A. NESBETT and Stanley J. McCutcheon, Appellees.**

**No. 2040.**

Supreme Court of Alaska.

Jan. 24, 1975.

---

**1326**

William G. Azar, Kennelly & Azar, John R. Spencer, City Atty., Anchorage, for appellant.

Raymond A. Nesbett, Anchorage, for appellees.

OPINION

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

BOOCHEVER, Justice.

This litigation involves a dispute as to the right of appellant, the City of Anchorage, to maintain a power line on property referred to as Block 34–A, Anchorage, which property is now owned by Buell A. Nesbett and Stanley J. McCutcheon (hereinafter appellees). Until 1960, the land.in question was owned by the federal government. In August of 1949, the Bureau of Land Management issued a special land use permit to the City of Anchorage allowing the City to use certain lands for general municipal purposes and to erect a municipally-owned power plant on certain property including Block 34–A. The per-

mit was valid for five years. The City promptly constructed a power line of approximately 50 feet in height running from south to north the full 300 foot width of Block 34–A. (The block is 660 feet long.) As it travels north across Block 34–A, the main power line branches in two places, first to the northwest and then to the northeast, forming a "Y" at the north end of the property. New lines have been added to the poles subsequent to their erection. The most recent such addition took place in 1970–71 while others had been added during the mid-1950's.

In October of 1950, the City wrote to the Bureau of Land Management relinquishing the special use permit. The then city manager testified that the relinquishment was tendered by mistake as it would not have been submitted had he realized it included the property on which the power lines were located. In August 1954, the City applied for another special land use permit including Block 34–A, but this time the application was rejected on or about May 11, 1956.

Block 34–A was subsequently transferred by the United States Government to Joe Blackard and Russell Swank. In return for legal services rendered in aiding Blackard and Swank to obtain the patent to the land, the middle third of Block 34–A (220 feet by 300 feet), was quitclaimed to appellees. These transfers took place in September of 1960 and on January 1, 1961 respectively. Shortly after they acquired title to the land involved herein, appellees became aware of the existence of the power line traversing approximately the middle section of their property.

In 1964, the City approached appellees asking to be granted an easement to anchor a down guy wire. The land affected by the easement was situated between the main north-south line and the northwest branch and partially overlapped the area the City now claims by prescriptive easement. Although appellees cooperated in executing the requested easement, they specifically crossed out on the mimeographed form the clause granting the City the right to maintain a telephone system, and to erect, construct and maintain an electric transmission and distribution system through, over and across the property; and in its stead merely granted permission to erect the anchor assembly. The City did not object to the alteration.

Sometime in 1965–66, appellees were approached by Gene Silberer who informed them that the City was interested in buying the land to expand their power plant. Silberer wished to represent Nesbett and McCutcheon in selling the land to the City. This was agreed to by appellees, but the negotiations proved fruitless. Again in 1970, Silberer, on behalf of appellees, contacted the City concerning the purchase of the land. Appellees indicated a willingness to accept payment in the form of bonds. At this point the City looked into the possibility of claiming the land by adverse possession.

On May 10, 1971, Nesbett wrote to City Manager Sharp requesting that the City take immediate steps to remove the power line. The City replied that the matter had been referred to the City Attorney's Office. On June 11, 1971, pursuant to a telephone call to the City Attorney's Office, Nesbett was informed of the City's claim of a prescriptive easement across his property defined at trial as encompassing an area of ten feet on either side of the power lines.

Appellees promptly instituted suit for the purpose of compelling the City to remove the power line. In addition, appellees requested reasonable rental for the use of their land by the City from the date that appellees acquired title until the City should remove the poles. Alternatively, appellees requested such damages, to be proven at trial, as would compensate them for the impairment of the economic use of the land occasioned by the presence of the power line. The City answered asserting

that it had obtained a prescriptive easement pursuant to AS 09.10.030.[1]

Based upon a finding that the City had maintained the power line in question with the implied permission of the appellees, the superior court judge concluded that no prescriptive easement had been proven. The judge also found that the appellees had established $84,000.00 as proper compensation for the value of the property taken by the City. Concerning the question of rent, the judge held that since there was no substantial evidence as to the rental value of the land, plaintiffs were not entitled to any rental payments. In conclusion, the judge ruled that the City could do one of three things: move the power line, acquire an easement and bury the lines, or pay the compensatory damages established by plaintiffs. Costs and $2,000.00 attorney's fees were awarded to plaintiffs. Defendants have appealed to this court claiming a multitude of errors below.

The primary question facing this court is whether the City's use of appellees' land was adverse, under a claim of right, or permissive.

A second major issue raised by appellant concerns the award of damages. Appellant asserts a variety of infirmities in the damages awarded. The major challenges to the award are that both the method of computation and the time of assessment were improper.

A number of secondary issues are raised by the City including:

1. Whether appellees were barred from bringing the action below by laches, equitable estoppel or the statute of limitations?

2. Should the trial judge have disqualified himself for bias?

3. Did the trial judge err in allowing alleged hearsay into evidence?

4. Did the trial court err in denying appellant's motion for a new trial?

I

## THE CLAIM OF EASEMENT BY PRESCRIPTION

 The requisites for a claim by prescription are essentially the same as for adverse possession except that a prescriptive claim is limited to certain rights in the land of another such as an easement.[2]

 Possession must be open, notorious, visible, continuous for the statutory period, and under a claim of right.[3] The word "hostile" is frequently used as a term of art meaning that the claim is "adverse" or under "claim of right", and that it is not subordinate to the title of the true owner.[4] Here there is no question but that the City's use was open, notorious, visible and continuous for the statutory period. The conflict arises over the question of whether the use was permissive as opposed to "hostile" or under a "claim of right".

 It is not disputed that the City's use of the property originated under a permit issued by the United States. While through a mistake the City at one time sent a letter relinquishing the permit, it thereafter applied for a new permit. In doing so, it again recognized the permissive nature of its use of the property. While the application for a renewed permit was denied, this did not alter the permissive use of the property. The rule is well settled that, when possession has begun permissively, it cannot acquire the character of adverse possession until the presumption of continued subservience is re-

---

1. AS 09.10.030 provides:
 No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of the action.

2. 6 R. Powell, Real Property § 1026 (rev. ed. 1973).

3. *Id.* §§ 1013–15.

4. El Cerrito, Inc. v. Ryndak, 60 Wash.2d 847, 376 P.2d 528, 532 (1962).

butted "by proof of a distinct and positive assertion of a right hostile to the owner of the property." [5]

In fact, since title by adverse possession may not be secured against the United States,[6] the City argues in its brief on appeal that it continued as a licensee of the federal government until patent was issued to Blackard and Swank in 1960. It is its contention that this event terminated the license and rendered the City's occupancy thereafter adverse to the subsequent owners.

■ It is true that the conveyance of a servient estate will in most cases constitute a basis for terminating a license.[7] But such an implied revocation, without more, does not ipso facto transform a permissive use into an adverse one.[8]

■ The effect of the issuance of a patent by the United States to Blackard and Swank was the same as though the United States had executed a quitclaim deed to them.[9] Thus, the transfer of the servient estate by patent constituted a conveyance by the United States of its interest in the property. Therefore, the situation presented here is analogous to that of a private landowner's transfer by quitclaim deed of property upon which a license had existed.

The Supreme Judicial Court of Massachusetts dealt with this identical situation in Sturnick v. Watson.[10] Plaintiff there sought to enjoin the defendant from destroying a brick wall of a building owned by the defendant which was supporting both defendant's and plaintiff's buildings.

A license had been given by defendant's predecessors in title to plaintiff's predecessor allowing the use of the wall for support of timbers of plaintiff's building. Some time later, an agreement was entered into whereby plaintiff's predecessors disclaimed any interest in the wall and agreed to remove the timbers whenever requested by defendant's predecessors.

The premises were thereafter conveyed without covenants or any reference to an easement through chain of title to defendant. Thus the plaintiff's predecessors had a license to use the wall to support timbers, (similar to the City's license for a maintenance of the power line) when the servient property was conveyed to a new owner, the defendant.

The defendant's building had deteriorated over the years so that the defendant sought to demolish it, including the wall in question. Defendant wrote to the plaintiff requesting that he remove the timbers. Plaintiff responded by bringing suit to enjoin destruction of the wall. The plaintiff's argument closely parallels that of the City here:

> The plaintiff has no easement for lateral support with respect to the defendant's wall by way of grant, and does not contend that he has. But he does contend that he has such an easement by prescription. He concedes that down to February 2, 1912, the use of the wall by his predecessors in title was under license. But on that date the premises now owned by the defendant were con-

---

5. Ayers v. Day & Night Fuel Co., 451 P.2d 579, 581 (Alaska 1969), *quoting* Hamerly v. Denton, 359 P.2d 121, 126 (Alaska 1961). *See* 6 R. Powell, Real Property § 1015 at 728 (rev. ed. 1973).

6. United States v. Springer, 321 F.Supp. 625 (C.D.Cal.1970), aff'd 491 F.2d 239 (9th Cir. 1974); Blask v. Sowl, 309 F.Supp. 909 (W.D.Wis.1967).

7. Radke v. Union Pacific R.R. Co., 138 Colo. 189, 334 P.2d 1077 (Colo.1959); Fine v. Strauss, 86 Ga.App. 354, 71 S.E.2d 580 (1952). *See generally* 3 R. Powell, Real Property § 428 (rev. ed. 1973).

8. Sturnick v. Watson, 336 Mass. 139, 142 N.E.2d 896, 898 (1957); Johnson v. Szumowicz, 63 Wyo. 211, 179 P.2d 1012, 1021 (1947).

9. The United States Supreme Court in describing the legal effect of a patent has stated: "As a deed, its operation is that of a quitclaim, or rather a conveyance of such interest as the United States possessed in the land . . . ." Wilson Cypress Co. v. Del Pozo y Marcos, 236 U.S. 635, 648, 35 S.Ct. 446, 451, 59 L.Ed. 758, 768 (1915), *quoting* Beard v. Federy, 70 U.S. (3 Wall.) 478, 491, 18 L.Ed. 88, 92 (1866).

10. 336 Mass. 139, 142 N.E.2d 896 (1957).

veyed by the trustees, who then owned the property, to another. This conveyance, the plaintiff argues, operated as a revocation of the license, and the use of the wall thereafter was a trespass and hence adverse.[11]

The court resolved the question by holding:

> It doubtless is the law that a license to use another's land is revocable not only at the will of the owner of the property on which it is to be exercised, but by alienation of the land by him. Hodgkins v. Farrington, 150 Mass. 19, 21, 22 N.E. 73, 5 L.R.A. 209; Scioscia v. Iovieno, 318 Mass. 601, 603, 63 N.E.2d 898. But it does not follow that, if the licensee continues to use the land as before, such use is necessarily adverse to the new owner. See Bond v. O'Gara, 177 Mass. 139, 142–143, 58 N.E. 275. Whether the use after the conveyance was permissive or adverse was a question of fact and on this issue the plaintiff had the burden of proof. Bigelow Carpet Co. v. Wiggin, 209 Mass. 542, 547–548, 95 N.E. 938; Tucker v. Poch, 321 Mass. 321, 323, 73 N.E.2d 595.[12]

In the *Sturnick* case, the trial judge found that the use of the wall was permissive until the defendant had requested the plaintiff to remove the timbers shortly before trial. Since no transcript of the evidence was presented on appeal, the finding of permissive use was upheld.

■ We concur in the Massachusetts Supreme Judicial Court's holding that continued use by a licensee after transfer of the servient parcel is not necessarily adverse to the new owner, and that the question of whether the use after conveyance was permissive or adverse is a question of fact on which the plaintiff had the burden of proof.

Similar to the *Sturnick* case is Scheller v. Pierce County[13] where there was a change in ownership of property after a five-year easement had been granted to the county by the prior owner. The use continued for 18 years. The Washington Supreme Court observed with reference to the requirement for conversion of an originally permissive use into an adverse one:

> Under the admitted facts in this case it seems to us that the use by the public was not adverse or in hostility to the title of the true owners. There was clearly no adverse holding during the period covered by the written contract, and nothing transpired after that time to convert the permissive use into an adverse use, except mere lapse of time. Ordinarily this will not suffice.[14]

As to what must transpire to convert a permissive use into an adverse use, the court observed:

> If permissive in its inception, then such permissive character being stamped on the use at the outset, will continue of the same nature, and no adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature, and exclusive and independent in its character.[15]

■ In the case before us, the trial court found that the use of the City after the transfer of the property from the United States was permissive rather than adverse.[16] Such a finding will not be overturned unless clearly erroneous.[17] We

11. *Id.* at 898.

12. *Id.*

13. 55 Wash. 298, 104 P. 277 (1909).

14. *Id.* at 278.

15. *Id.*

16. The trial court relied in part on our holding in Ayers v. Day & Night Fuel Co., 451 P.2d 579, 582 (Alaska 1969). There we held

that one's use of another's land was presumed to be permissive. That presumption is overcome only by a showing that such use of another's land was adverse, that is, by proof of a distinct and positive assertion of a right hostile to the owner of the property. This is the same test advocated in the *Scheller* case.

17. Ayers v. Day & Night Fuel Co., 451 P.2d at 582.

must thus examine the evidence and the reasonable inferences from that evidence in order to ascertain whether the trial court's finding of permissive use was erroneous.

In making such an examination, our most recent opinion pertaining to adverse possession is of considerable assistance. In Peters v. Juneau-Douglas Girl Scout Council,[18] we held that Mr. Peters had established a claim to property by adverse possession. A question was presented as to whether Peters had failed to satisfy the hostility requirement for adverse possession in that it was contended that his possession was permissive and therefore subservient to the true owner's legal title. We thus were confronted with many of the same issues presented by the claim of the City. There we stated:

> The test for determining the existence of the requisite degree of hostility is a fairly objective one. The question is whether or not the claimant acted toward the land as if he owned it.
>
> \* \* \* \* \* \*
>
> From the standpoint of the true owner, the purpose of the various requirements of adverse possession—that the nonpermissive use be actual, open, notorious, continuous, exclusive and hostile—is to put him on notice of the hostile nature of the possession so that he, the owner, may take steps to vindicate his rights by legal action.[19]

Here we are concerned with the acquisition of an easement so that the test would be whether the City acted as though it was claiming a permanent right to that easement.

▮ In Peters' case, his use of the land neither originated nor continued under consent of the titleholder. His right to possession was derived from his uncle's possession of the land, not from any acquiescence, consent or permission of the predecessors in title of the Juneau-Douglas

Girl Scout Council. There was no evidence that the uncle's possession originated by permission of the titleholder. In contrast to that situation, the City's possession originated in a permit from the United States, the predecessor in title of appellees, and the City admits that it continued to occupy the land as a licensee after its permit terminated and until such time as the land was conveyed to Blackard and Swank and from them to appellees.

Peters had lived on the land for substantial periods of time each year for over 40 years. He had placed structures on it, marked the boundary of the land he claimed and actively asserted ownership.[20] In contrast, the City, having commenced its possession by permission of the legal titleholder, far from indicating to appellees that they were claiming the easement hostile to them, gave the true owners reason to believe that its possession was permissive. The City sought permission for an easement to attach a guy wire in an area partially within that claimed for the easement by prescription. No objection was made when appellees deleted the portions of the document granting the easement prepared by the City, that pertained to the right to maintain a telephone system and "erecting, constructing and maintaining an electric transmission and distribution system through, over, across and under the property involved." At the time of the deletion by appellees, it would appear that candor would have required a statement that the City was claiming that easement as its own, but apparently no such indication of hostility was given.

There was further testimony, elicited by the City on cross-examination of Nesbett, of negotiations by the City in 1964, 1965 or 1966 to buy the property at a price of $1.00 a square foot for the entire 66,000 square feet. This included the property over which the easement by prescription is now claimed. Again, it would appear that if the City were claiming the right to the

18. 519 P.2d 826 (Alaska 1974).

19. 519 P.2d at 832.

20. 519 P.2d at 828.

easement hostile to the true owners, some mention would have been made of it and a contention would have been advanced that the price should have been reduced accordingly. Moreover, Nesbett and McCutcheon paid the taxes on the entire tract from 1961 through the date of trial, and there was never any indication that the City took the position that the easement belonged to the City, thus reducing the value of the property.

While none of these incidents is overwhelmingly significant in and of itself, the combination of them presents a sharp contrast with the facts of the *Peters* case,[21] and we conclude that the trial court's finding that the City's use was permissive rather than adverse was not clearly erroneous.

## II

## DAMAGES

■ Appellees introduced evidence as to their damage in the event that the power line is not removed. The City first challenges the standing of appellees to raise the issue of damages contending that any "taking" of the property occurred when the United States transferred title to Blackard and Swank, and that any right of action which they had was not transferred in turn to appellees.[22] The argument is disposed of by our holding that the City's use was permissive until appellees demanded that the power line be removed in 1971. The right to damages does not arise until the City refuses to remove the power line. The court awarded damages only in the event that the power line is not removed or buried under appellees' land as the result of an agreement to be worked out with ap-

pellees. Since appellees are the present owners, they have standing to raise the damage issue.[23]

Of more weight is the City's argument as to the evidence considered by the court in awarding the damages. In that respect, the appellees alone presented evidence as to the amount of damages, and thus unless evidence was improperly admitted, the court had that testimony, alone, to consider in making its award. In attempting to establish the economic injury caused by the City's power line, appellees in the trial below called as one of their witnesses, a real estate appraiser. The appraiser testified that, working with an appraisal of the property in question which was drawn up by his office six months before, he first arrived at a fair market value of the property without the power line in place. The figure thus arrived at was $132,000.00. The most common method to apply to determine the value of the property with the power line in place would be to find sales of comparable property. However, no such piece of property, with a power line running through the approximate middle, could be found. Therefore, the appraiser used a second method which involved calculating the value of the income stream from the property with and without the power line, determining a ratio and applying this ratio to the present value of the property without the power line. The value of the property with the power line was found to be 36.36 percent of its value without the power line, resulting in damages to the property by virtue of continuance of the power line in the amount of $84,004.-80.[24]

---

21. *See* Oxenberg v. State, 362 P.2d 893, 897 (Alaska 1961), appeal dismissed, cert. denied 368 U.S. 56, 82 S.Ct. 189, 7 L.Ed.2d 128 (1961), where we considered a combination of evidentiary facts in determining that there was adequate corroboration of an accomplice's testimony.

22. Some support for this position may be found in Taylor Investment Co. v. Kansas City Power & Light Co., 182 Kan. 511, 322 P.2d 817, 828 (1958).

23. Appellees will suffer a "concrete injury" if the line is not removed. Schlesinger v. Reservists Committee to Stop War, 418 U.S. 208, 94 S.Ct. 2932, 41 L.Ed.2d 706 (1974). *See* Sierra Club v. Morton, 405 U.S. 727, 738, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636, 645 (1972).

24. To determine the value of the income stream from the property, an assumption was made that the highest and best economic use of the property would be to construct a ware-

In attacking this method of computing damages, appellant refers the court to Arlen of Nanuet, Inc. v. State.[25] The court therein found egregious error in the lower court's acceptance of a manner of calculating land value based on capitalization of income expected from buildings not yet constructed on the land. In its decision rejecting capitalization of income from non-existent buildings as a proper method of calculating the market value of land, the New York Court of Appeals reasoned that to determine market value in this fashion is a distortion of the realities.

As we observed in the *Levin* [Levin v. State of N. Y., 13 N.Y.2d 87, 242 N.Y. S.2d 193, 192 N.E.2d 155] case, one cannot "expect the prospective purchaser to pay for the vacant land in suit an amount equal to the worth of the conjectured net rental income . . . for, then, he would be paying an amount which would preclude any profit" . . . .. We might have added, what is implicit in the opinion, that, if one paid before construction an amount equal to the value of the conjectured net income, he would not only have been precluding any possibility of profit but, indeed,

might be letting himself in for a loss if the conjectured net income did not later materialize. Moreover, we went on to say, an experienced prospective purchaser, in determining the price he would be willing to pay, would be most directly concerned with "what other properties were selling for" and with what other "competitive alternatives"—fees or leaseholds—"were available" to him . . . .[26]

█ We find appellant's reliance on the New York case misplaced. In that case, the lower courts allowed the market value of the land to be established on the basis of such capitalization of income, whereas in the present case, the capitalization of income from non-existent buildings was used not to determine a market value but rather to establish a ratio.[27] This ratio was then applied to the market value of the land without the power line, which market value was determined on the basis of comparable sales. Obviously, the above reasoning is not applicable to the present case, since in this case the figures determined through capitalization of income were not used to establish the market value of the land.[28]

house on it. Without the power line on the property, it was estimated that a warehouse of 55,000 square feet could be constructed assuming that the warehouse would be served by semi-truck trailers which required a certain maneuvering space. (Appellant asserts as error the fact that appellees' expert witness testified as to the space needed to park and unload semi-truck trailers since it was not shown that the witness had any expertise in this area. Certainly, any such error is not of great significance and will have no impact on the ultimate outcome of the litigation. Secondly, it is questionable whether expert qualifications are necessary to testify to the approximate space required to maneuver and park a semi-truck trailer.) At a rental of $.30 per square foot, the warehouse would return a net income of $148,500.00 annually. Assuming the building has 50 years of useful life and capitalizing the annual income at 9 precent produces an income stream value of $1,627,857.00. The same calculations based on the warehouse which could be constructed with the power line on the property result in an income stream value of $591,948.00 or .3636 of the income stream value without the

poles. This ratio was then applied to the estimated fair market value of the property producing a figure of $47,995.20. This is said to represent the fair market value of the property with the power line in place. Since it was contended that the property without the power line had a value of $132,000.00, the damages were calculated to be $84,004.80.

25. 26 N.Y.2d 346, 310 N.Y.S.2d 465, 258 N.E.2d 890 (1970).

26. Arlen of Nanuet, Inc. v. State, 26 N.Y.2d 346, 353, 310 N.Y.S.2d 465, 468, 258 N.E.2d 890, 892 (1970) (citations omitted).

27. The ratio thus created represented a comparison between the capitalized income from the warehouse which could be constructed if the power line were not present and the warehouse which could be constructed in the presence of the power line.

28. Even if the New York case relied on by the City were found to be applicable here, we held in Dash v. State, 491 P.2d 1069 (Alaska 1971), that where the highest and best use of a piece of property was found to be as an industrial subdivision, an expert's testimony

For the same reason, this court's opinion in Dash v. State [29] does not provide support for appellant's position. On the contrary, statements by this court in *Dash* tend only to undercut portions of appellant's arguments. At one point, appellant contends that the hypothetical construction of a warehouse on the property in order to obtain a capitalization of income figure is far too speculative to serve as a factor in assessing damages. Yet in *Dash* this court stated:

> Since there was testimony below that the highest and best use of the property was as an industrial subdivision, and evidence that other property in the immediate area was subdivided for industrial purposes, the proposed subdivision was not purely conjectural or speculative.[30]

Concerning income capitalization as a means of appraisal, the court in *Dash* recognized:

> Indeed, income capitalization in general and the anticipated use or development method in particular are standard appraisal practices. It would be unwise for us to require exclusion of such a widely-recognized method of valuation through unduly rigid evidentiary rules.[31]

We find there was no error here in considering the income flow which could reasonably be anticipated from the highest and best use of the property with and without the power line for the limited purpose of ascertaining the proportion which would constitute a loss to the fair market value of the property due to the power line's continued existence.

## III

## TIME FOR ASSESSMENT OF DAMAGES

The damages were determined as of August 31, 1972, one week prior to trial, rather than as of June 1, 1971, the date found by the trial court to be the date of taking. Each party to this appeal refers the court to cases which hold contrary views as to the proper time to assess damages. The City of Anchorage cites Arlen of Nanuet, Inc. v. State [32] for the holding that compensation should be determined as of the date of taking. Nesbett and McCutcheon rely on Koerber v. City of New Orleans [33] for the contrary proposition that the time for fixing compensation should be the date of the initiation of the condemnation action. A survey of the holding on this question reveals considerable disagreement among the states as to the proper moment to assess damages.[34] However, the Oregon Su-

---

which capitalized the anticipated income to be derived from sales of the subdivided lots in order to estimate the market value of the land was properly admitted.

29. 491 P.2d 1069, 1074 (Alaska 1971). Appellant seeks to rely on that portion of our opinion in *Dash* where we stated:

> Finally, two important factors tended to increase the reliability of the "best use" evidence as introduced at the trial below. *First, the evidence concerned proceeds from a future sale of the land itself, and not the impact the income from a non-related business venture conducted on the land might have on the market value—the latter necessarily being much more speculative in nature.* (Emphasis added).

As we noted previously, in *Dash* we dealt with the admissibility of expert testimony which sought to establish market value through capitalization of potential income. That precise question is not now before us. In the instant case, market value was determined through the comparable sales method. Moreover, we note that the second factor referred to in *Dash* as tending to increase the reliability of the "best use" evidence was also present here.

> [That is,] the evidence was not presented to the [court] for its [independent] consideration, but was part of an expert's appraisal prepared pursuant to accepted appraisal practices and carefully explained to the [court].

30. *Id.* at 1074. At trial in the instant case, testimony indicated that warehouses had been built on property both immediately adjacent to and across the street from the property in question.

31. *Id.* at 1075 (footnote omitted).

32. 26 N.Y.2d 346, 354, 310 N.Y.S.2d 465, 469, 258 N.E.2d 890, 893 (1970).

33. 228 La. 903, 84 So.2d 454, 458 (1955).

34. Annot., 2 A.L.R.3rd 1038 (1965).

preme Court in State v. Stumbo,[35] provides a thoughtful analysis of these divergent holdings and concludes that the proper approach is to assess damages at the time of the initial entry or taking and to grant the property owner legal interest ·from that time until compensation is paid. In reaching such a conclusion, the court begins with an examination of what it considers to be the most frequently voiced rationale for each holding. With reference to those decisions which assess damages as of the date of the condemnation proceedings, two possible justifications are noted. First, there is the theoretical argument that in a strictly legal sense, no taking occurs until the landowner is divested of his interest in the property by judicial proceedings. Secondly, it is often reasoned that the trespasser should be penalized for his unlawful act and, therefore, compensation should be assessed at the later of the two possible dates. The Oregon court failed to find the first reason persuasive for the practical consideration that regardless of the fact that no legal taking may have occurred by reason of the trespass, the landowner is just as effectively deprived of the use of his property.[36] Regarding the idea of penalizing the trespasser, the court observes that in many cases, the landowner may well have been equally at fault, having not promptly asserted his rights. (We further note that in many situations, as illustrated by the present case, neither party may be at fault). Moreover, such a rationale presumes appreciation of property without exception, for if the property were to decline in value, as it occasionally does, the penalty would fall on the landowner.

On the other hand, the Oregon Supreme Court found persuasive reasons for fixing the time for computing the value of the property as of the date of the initial taking. Other than the avoidance of the fictions and problems involved in the justifications for the alternate approach, the court found compelling the fact that under its approach, damages are ascertained at a fixed rather than shifting date.

> There will be no motive on either side to drag out negotiations in the hope of a favorable moment to demand condemnation; and settlement of claims rather than litigation will be encouraged.[37]

The court recognizes that such a result will have the effect of denying the landowner a reasonable rental for the period of unlawful occupation but observed that:

> . . . [L]egal interest on the award of damages, measured from the date of entry, has been widely accepted as a fair value for the use of the lands taken where the condemnor goes into possession before the trial of the condemnation action.[38]

We are in agreement with the decision of the Oregon Supreme Court in *Stumbo* and, accordingly, hold that in this case damages should have been assessed as of June 1, 1971, the date found by the trial court to mark the initial taking, rather than August 31, 1972. This holding is consistent with our opinion in State, Department of Highways v. Crosby,[39] where we stated that, by stipulating to the fact that the date for determination of just compensation would be the date the state appropriated the property without previously instituting condemnation proceedings, the parties recognized the action as being in the nature of inverse condemnation.

Since the difference in damages may be significant,[40] we find it necessary to re-

35. 222 Or. 62, 352 P.2d 478 (1960).

36. Our decision in Stewart & Grindle, Inc. v. State, 524 P.2d 1242, 1246, is in accord with this conclusion. There we noted that while vesting of title of property in the state does indeed mark a constitutionally-compensable taking, this is not a prerequisite to a finding of such an appropriation since a constitutionally-compensable taking may also occur when the state first enters into actual posses-

sion of the property . or takes constructive possession thereof by depriving the landowner of full beneficial use of his land.

37. 352 P.2d at 483.

38. 352 P.2d at 483–484 (citations omitted).

39. 410 P.2d 724, 729 (Alaska 1966).

40. In updating an appraisal of the subject property, the expert witness called by Nesbett

mand this case to the superior court for the limited purpose of determining that difference and recalculating the damages as of June 1, 1971.

## IV

## OTHER CONTENTIONS OF THE CITY

Appellant argues that the testimony of appellees' expert witness was in large part hearsay, and thus admission of such testimony was error. However, appellant did not object to the testimony at the time it was given. Hearsay testimony which is not objected to is fully competent.[41] Appellant wishes this court to consider the lower court's reliance on this testimony as plain error and take note of it even though the proper objection was not made in the court below. This court has held that it will " . . . consider plain errors, even though not objected to below, which are so substantial as to result in injustices."[42] In the instant case, under the above standard, the admission of and reliance upon what the appellant labels hearsay testimony did not constitute plain error.[43]

Appellant also urges that appellees should never have been allowed to bring their action for three reasons. First, it was barred by the statute of limitations. This involves the whole question of wheth-er appellant acquired title by adverse possession which has been thoroughly discussed above. Alternatively, it is argued that since appellant, with the knowledge of appellees, erected valuable improvements on appellees' land, equitable estoppel should now bar appellees from claiming relief in the courts. The improvements referred to are the new lines placed on the poles in 1970. It hardly seems these could be considered improvements, and it is doubtful that appellees were aware of the new lines. In short, the argument is without merit.[44] Finally appellant mentions laches as a possible bar to appellees' action but does little else to develop this argument which we also hold to be without merit.

Similarly lacking in substance are appellant's contentions that the trial judge abused his discretion in admitting certain hearsay, and that he should have disqualified himself because of his obvious bias.

As to the hearsay question, appellant argues that the trial court committed reversible error when it admitted testimony as to the statements of a dead man. This objection arises out of a mistake on the part of Nesbett who confused one Roy Nigh with Gene Silberer. Because of this confusion, Nesbett testified that it was Nigh who approached him concerning selling the land in question to the City. Nigh is now dead and was in fact dead at the

---

and McCutcheon calculated that in a six-month period the property appreciated slightly over $9,000. Thus, it may be assumed that the value of the property as of August 31, 1972 was substantially greater than as of June 1, 1971.

41. Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 252, 56 L.Ed. 500, 503 (1912).

42. Merrill v. Faltin, 430 P.2d 913, 917 (Alaska 1967). *Accord* State v. Ness, 516 P.2d 1212, 1214 n. 6 (Alaska 1973). *See also* Holiday Inns of America, Inc. v. Peck, 520 P. 2d 87, 91 (Alaska 1974).

43. Appellant seems to claim that the expert witness simply conjured up the figure of $132,000.00, but the facts are otherwise. The expert witness explained how the appraisal which his office did was calculated, his personal adoption of it, and how he up-dated that appraisal to reach what he found to be the present value. To the effect that a qualified valuation expert may rely on hearsay in reaching his computations, *see* Dash v. State, 491 P.2d 1069, 1075 (Alaska 1971); Grain Dealers Mut. Ins. Co. v. Farmers Union Co-op. Elevator & Shipping Ass'n, 377 F.2d 672, 679 (10th Cir. 1967).

44. Upper Harmony Ditch Co. v. Stunkard, 177 Colo. 6, 492 P.2d 631, 634 (1972) (estoppel is not customarily viewed as a basis for establishing a right); Farmers Reservoir and Irrigation Co. v. Fulton Irrigating Ditch Co., 108 Colo. 482, 120 P.2d 196, 205 (1941) (enumerates elements of estoppel); Koerber v. City of New Orleans, 228 La. 903, 84 So. 2d 454, 458 (1955) (except by the laws of prescription, mere silence or delay cannot effect a loss of title).

time the negotiations were to have taken place. Nesbett meant to refer to Silberer, and this mistake was corrected prior to the end of the trial. The judge did sustain appellant's objection to Nesbett's testimony as to what Silberer related to him as hearsay. However, the judge properly allowed the testimony in as evidence of Nesbett's state of mind,[45] and similar testimony was subsequently given in answer to the City's questions on cross-examination.

■ Appellant's contention that the trial judge should have disqualified himself due to alleged bias in favor of appellees centers around certain statements made by the judge. We have reviewed the judge's statements relied upon by the City and find frivolous its contention that they indicated a bias in favor of appellees.

■ In its supplemental reply brief, appellant alleges error on the part of the trial court in denying appellant's motion for a new trial. This request for a new trial is based on what appellant calls new evidence which it contends supports and fortifies appellant's position that the use by the City of appellees' property was not permissive during the time the land was owned by the United States. The so-called new evidence consisted principally of the City's 1954 application for a special land use permit and the rejection thereof discussed previously in this opinion. We find no error in the denial of the motion.

Affirmed in part and remanded in part.[46]

ERWIN and FITZGERALD, JJ., not participating.

45. International Longshoremen's and Warehousemen's Union v. Juneau Spruce Corp., 189 F.2d 177, 13 Alaska 291 (9th Cir. 1951), aff'd 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952).

46. Since the case is being remanded to the trial court for reassessment of damages, ■ that court may also consider the City's request for an extension of time for the removal of its improvements, in the event that it so elects until suitable weather conditioned on an appropriate payment of rent.