OPINION.
The Shell Oil Company appeals the decision of the trial court denying it a prescriptive easement over property owned by the DeVal Company. The easement concerned a "cut-though" allowing drivers to gain access to a corner Shell station by driving across the rear parking lot of a strip mall owned by DeVal. According to Shell, the trial court both misunderstood the law and misweighed the evidence in determining that its use of the parking lot was permissive rather than adverse.
In its cross-appeal, DeVal argues that the trial court erred by limiting the issue at trial to whether Shell's use was adverse. According to DeVal, the trial court should have also considered whether any putative prescriptive easement was terminated when Shell acquired rights to an adjacent property and rebuilt the station facility to include a combination gas station, convenience store, and McDonald's restaurant. According to DeVal, the expanded Shell operation necessarily caused an increase in traffic using the cut-through, rendered the cut-through more visible due to the reconfiguration of the building, and resulted in an increase of trash and parked vehicles on DeVal's property.
For the reasons that follow, we affirm the trial court.
 I.
In the 1950s the Bettman family owned both the Shell property and the DeVal property. The part of the property now owned by DeVal had a shopping center on it; the part of the property now owned by Shell was occupied by an Alber's supermarket. Because of the presence of the Alber's loading dock, the grade between the properties was not even, varying by a height of four to five feet, and thus making it impossible for vehicular traffic to pass between them.
Shell purchased the corner property in 1967 and tore down the Alber's supermarket to build a gas station. By that time the corner property had been sold as a separate parcel from the shopping-center property. The shopping-center property had itself changed hands: the Rouse Company under the name of North Hills Company owned it. Gilbert Bettman, the grandson of the original owner, acted as local agent for the Rouse Company. He testified that he had a "very clear recollection" that he was contacted by "someone who was in charge of the development of the Shell property" and asked if it was "okay" if Shell were to raise the grade of its property so that it was level with the shopping-center property. (Upon cross-examination, however, Bettman testified that he "couldn't swear" that the person he spoke to was a Shell representative or a contractor, although he "thought it was somebody from Shell.") He characterized his response to the inquiry as follows:
 Well, obviously, why would we have any objection[?] It was just a mutual convenience. It was a temporary thing and nobody had — I didn't have any idea that we would have any rights over the Shell property if they wanted to put some kind of building up, but I assumed they had no idea, and I had no thoughts of ever giving them any kind of permanent rights. It was just a mutual convenience, so I said, sure, it's okay.
Bettman was then asked what he would have done if he had intended to grant Shell "permanent rights," to which he responded:
 Well, as I mentioned, I was a lawyer. I know about easements. I know about that kind of thing, and I wouldn't have dreamed of giving them any kind of rights nor expect any rights from them. They never asked me for anything except it was sort of a recognition of reality. I mean, the realities were, it was a matter of courtesy. Would you say to a neighbor, no you can't put your — I'm going to put a fence there. No. It was a matter of courtesy.
Bettman also testified that he did not possess the authority to grant Shell an easement, even if he had intended to do so. He further described his "okay" to the idea as one borne of the realization that he could not prevent Shell from raising its property up to the level of the shopping-center property. He stated, "I wouldn't be such a stickler as a neighbor to put up a fence there, which would be the only way you could realistically stop somebody who was parked in one place and wanted to go to the other." He testified further that the reason he was certain that his "okay" was "just a neighborly temporary kind of thing" was the lack of any reciprocal agreement granting the Rouse Company enforceable rights across the Shell property.
As soon as the two properties were made level, traffic began to utilize the cut-through in both directions. The cut-through was advantageous to the shopping center in that it gave customers access from Gailbraith Road; it was advantageous to Shell because it gave its customers a secondary access off Hamilton Avenue when traffic stacked at the intersection of both roads during the peak hours.
In 1972, the shopping-center property again changed hands, being sold to its present owners, the DeVal Company. The cut-through between the two properties continued. Twenty-four years later, in 1996, Shell entered into negotiations with McDonald's to develop its property and an adjacent property as a "T.I.U." — totally integrated unit. The T.I.U. would be a "co-brand" facility — a one-stop, fast-food restaurant, convenience store, gas station, and car wash.
The evidence produced at trial before a magistrate demonstrated that, in contemplating the venture, McDonald's considered the access provided by the cut-through important, if not critical, to the success of the operation. When McDonald's discovered that there was no recorded easement, it contacted Shell, which then contacted DeVal. Stephen Ragusa, the senior real estate representative for Shell, spoke to Alan Stein, one of the owners of DeVal. The purpose of the discussion was to verify the absence of a recorded easement. When Stein confirmed the absence of such an easement, Ragusa asked if a written agreement could be reached. Stein refused.
Stein testified that his understanding of the cut-through was that it was for the mutual benefit of both properties. He stated that he could not remember if a title search of the property in 1972 had disclosed an easement involving the cut-through. Upon cross-examination, he conceded that he was unaware of any formal agreement underlying the reciprocal use of the cut-through. He testified that he never had discussions with anyone from Shell regarding the cut-through from the time DeVal purchased the property in 1972 until the time he was contacted by Ragusa in 1996. He also stated that he could not remember ever discussing the issue with Bettman.
Stein stated that when Ragusa contacted him to negotiate an easement, he was "fearful." He stated, "I was afraid there was an unknown factor and that it would become a burden, particularly to our tenants. I suggested that we just let it go and see what happens. I said we had been good neighbors all these years; it's been for our mutual benefit, why not just wait and see what happens."
Stein also testified that, after construction of the T.I.U., "there's definitely more traffic" in the cut-through. He testified that there was trash from McDonald's coming onto the shopping-center property. He stated that delivery trucks parked on shopping-center property to unload their cargo, despite the presence of no-parking signs. According to Stein, when he took the issue up with the driver of one of the delivery trucks, the driver advised him that there was no place to park on the Shell property.
Jerry Devitt, Stein's partner in DeVal, testified that when the company purchased the property in 1972, it was his understanding that the cut-through was a "mutual benefit." He corroborated Stein's opinion that the cut-through had been subjected to greater use since the building of the T.I.U. He also opined that the majority of cars were using the cut-through as access to the T.I.U. rather than to the shopping center. He stated that since the construction of the T.I.U., there had been "substantially more problems," including complaints from his tenants at the shopping center, trash from McDonald's ("wrappers, French fries, food dumped in the lot"), and parked delivery trucks on shopping-center property. Devitt also testified that the reconfigured facility on the Shell property made it more difficult for shopping-center customers to take advantage of the cut-through. Upon cross-examination, Devitt testified that he could not recall having any discussions with Bettman concerning the cut-through.
Both sides presented expert testimony. Ronald Roberts, a civil engineer retained by DeVal, gave his opinion that the T.I.U. had created "much more" traffic across the cut-through. He conceded upon cross-examination, however, that he lacked the data to say how much more. Conversely, John Pflum, another civil engineer retained by Shell, testified on behalf of Shell that the flow of traffic through the cut-through would not cause "any type of congestion or any type of negative impact on either the DeVal property or the McDonald's and the Shell property." He stated that "[t]he total volume of traffic to the site is probably more because of the type of site, additional brands involved, but because of the design * * * it's likely that the crossing traffic, the shared driveway traffic is not any more, and, in fact, could be less than it was * * * when the old Shell station was operating * * *." Upon cross-examination, however, Pflum was also forced to concede that the lack of data precluded any analysis of the traffic conditions that existed before the new facility was constructed.
 II.
The magistrate concluded that Bettman's testimony was sufficient to demonstrate that Shell had asked for, and received, permission to use the cut-through in 1967. The magistrate then reasoned:
 The original permission granted by Judge Bettman continued for all practical purposes. DeVal permitted Shell customers to utilize its parking lot and access to Hamilton Avenue. Shell permitted DeVal customers to pass through their lot so as to access Galbraith Road. No where in the testimony was any assertion by Shell that beginning in 1972 or at any time thereafter, it specifically claimed any type of license or right to access and cross over DeVal's property. No letter was sent asserting such right, no meeting took place asserting such right and thus there was no appreciation by DeVal that any type of adverse claim was being made.
The magistrate then addressed the issue, raised by Shell, that any permission granted by Bettman on behalf of the Rouse Company could not be "tacked" on to DeVal's ownership of the property. In rejecting Shell's argument, the magistrate concluded that "[t]he permission which Judge Bettman had originally granted continued by virtue of the two way use. * * * Such two way use is implied permission. This implied permission negates a prescriptive use."
The trial court subsequently adopted the magistrate's decision, dismissing Shell's claim for a prescriptive easement and granting DeVal's counterclaim seeking quiet title to the property.
 III.
In its first assignment of error, Shell argues that the trial court erred as a matter of law in determining that its use of the cut-through was permissive rather than adverse. Specifically, Shell argues that the record shows only that DeVal acquiesced in its use of the cut-through but did not give its "permission in fact." Further, Shell argues that even if the trial court was correct in concluding that Bettman gave permission to Shell for the use of the cut-through in 1967, that permission was on behalf of the Rouse Company and expired in 1972 when DeVal purchased the shopping-center property.
In order for a use to be considered adverse, it must necessarily be without the property owner's permission and inconsistent with the property owner's rights. Keish v. Russell
(Sept. 11, 1996), Athens App. No. 95CA 1686, unreported. Adversity does not require that the use be a source of enmity, ill will, or even conflict between the property owner and the user. Crawfordv. Mattthews (Sept. 21, 1998), Scioto App. No. 97CA2555, unreported. A use is adverse so long as it is inconsistent with the property owner's rights. Furthermore, a use does not necessarily become permissive simply because the property owner does nothing to prevent it out of indifference, laziness, acquiescence, or "neighborly accommodation." Gerstenlager v.Lloyd (Feb. 15, 1995), Summit App. No. 16814, unreported.
On the other hand, the landowner's permission need not be express — it may also be demonstrated by necessary implication. Id., citing 25 American Jurisprudence 2d (1966) 462-463, Easements and Licenses, Section 54; Houser v. Proctor (Feb. 15, 1991), Erie App. No. E-89-58, unreported. Admittedly, the difference between acquiescence, tacit or "neighborly" accommodation, and implied permission may be difficult to discern, not only factually, but definitionally. Black's Law Dictionary defines acquiescence as "equivalent to consent inferred from silence"; accommodation as an "arrangement or engagement made as a favor to another, not upon a consideration received"; and permission as an "act of permitting, formal consent, authorization, leave, license, or liberty granted * * *." Black's Law Dictionary (4 Ed. 1979), 15, 22, 1026.
The ultimate issue, however, is whether the property owner passively assented to an uninvited infringement of his or her rights — i.e., was slumbering — or whether he or she in some manner formally consented to the use, granting the user leave or license to come onto the property.
 Prescription, like adverse possession, is effectively, a statute of limitations. See 1 Curry Durham, Ohio Real Property Law and Practice (5 Ed. 1996) 276, 291, Sections 7-1 and 7-8(a); 2 Ohio Jurisprudence 3d (1998), 431, Adverse Possession, Section 5. "The principle upon which the limitation operates, is, that the adverse claim is accompanied by such an invasion of the rights of the opposite party as to give him a cause of action, which he has failed to prosecute within the time limited by law, and which he is therefore presumed to have surrendered or abandoned." Clark v. Potter
(1876), 32 Ohio St. 49, 63-64; See, also, 2 Ohio Jurisprudence 3d (1998) 431, Adverse Possession, Section 5.
Crawford, supra. The determination of whether a landowner slept on his or her rights, or actually permitted the use, depends upon the facts of each particular case. Id.; Glander v. Mendenhall
(1943), 39 Ohio Law.Abs. 104, 68 N.E.2d 105.
It is important to note that prescriptive easements are not favored in the law. See Van Buren v. Worley (Dec. 1, 1995), Lucas App. No. L-95-047, unreported. The maxim "the law abhors a forfeiture" applies to such easements because they result in a legal titleholder forfeiting rights to another without compensation. See Grace v. Koch (1998), 81 Ohio St.3d 577,692 N.E.2d 1009. Consequently, in order to establish a prescriptive easement, the burden is on the claimant to demonstrate all the elements not simply by a preponderance of the evidence, but by clear and convincing evidence. Id.
This rule is subject to one caveat: the Ohio Supreme Court has held that where a claimant makes a prima facie showing of a prescriptive easement, the burden shifts to the landowner to show that the use was permissive. Pavey v. Vance (1897), 56 Ohio St. 162,46 N.E. 898, paragraph one of the syllabus. This does not mean, however, that the ultimate burden of persuasion is shifted. As observed in Crawford:
 Modern Ohio cases have variously characterized the burden of proof concerning adversity. [Citations omitted.] The only way to harmonize these cases is to recognize the majority rule that evidence of continued use of another's property for the period of prescription generally gives rise to a rebuttable presumption of adversity. This shifts the burden of going forward to the defendant to present some evidence of permissive use. The ultimate burden of persuasion rests with the claimant. [Citation omitted.]
As we have noted, Shell argues that the trial court's ultimate decision was wrong even if it was right in concluding that the use of cut-through was originally permissive as a result of the discussion in 1967 between Bettman and a company representative. According to Shell, whether Bettman gave Shell permission on behalf of the Rouse Company is "wholly irrelevant" because the law does not allow permission to be tacked between landowners.
Although noting that the issue of tacking in the context of prescriptive easements may be one of first impression in Ohio, Shell makes its argument against tacking on two grounds: first, common sense (permission from one is not permission from another), and, second, the law of licenses. In regard to the latter, the general rule in Ohio is that licenses do not run with the land.Ohio Valley Advertising Corp. v. Linzell (1958), 168 Ohio St. 259,153 N.E.2d 773. When the land is sold, the license stops.Weir v. Consolidated Rail Corp. (1983), 12 Ohio App.3d 63, 65-66,465 N.E.2d 1341, 1345.
Consequently, Shell argues, the fact that Shell may have obtained permission for the use of the cut-through in 1967 from the Rouse Company does not matter — what does matter is the period between 1972 and 1996 when Shell continued to use the cut-through without ever formally seeking or receiving permission from DeVal.
The flaw in Shell's argument is that it cannot be reconciled with certain core principles underlying the law of prescription. First, a permissive use is not adverse and will never ripen into a prescriptive right. Pennsylvania Rd. Co. v. Donovan (1924),111 Ohio St. 341, 145 N.E. 479, paragraph one of the syllabus. In order for a use that began as permissive to become one that is hostile, the user must in some way demonstrate this metamorphosis to the landowner — otherwise, the landowner cannot be faulted for failing to assert his or rights. As the Ohio Supreme Court has held:
 [a] use of the premises [that is] permissive in the beginning can be changed to one which is hostile and adverse only by the most unequivocal conduct on the part of the user, and evidence of adverse possession must be positive and strictly construed against the person claiming a prescriptive right to an easement.
Hinman v. Barnes (1946), 146 Ohio St. 497, 66 N.E.2d 911, paragraph two of the syllabus.
Shell argues that the necessity of such notice only arises with respect to the landowner that extended permission. According to Shell, when the servient property is conveyed, the slate is wiped clean and the use becomes, ipso facto, adverse with respect to the new owner. We have found no Ohio cases, and none have been cited to us, that discuss this exact point. DeVal, however, has cited several cases from other states that reject Shell's position. In one such decision, the Massachusetts Supreme Judicial Court stated:
 It doubtless is the law that a license to use another's land is revocable not only at the will of the owner of the property on which it is to be exercised, but by alienation of the land by him. [Citations omitted.] But it does not follow that, if the licensee continues to use the land as before, such use is necessarily adverse to the new owner. [Citation omitted.] Whether the use after the conveyance was permissive or adverse was a question of fact and on this issue the plaintiff had the burden of proof. [Citation omitted.]
Sturnick v. Watson (1957), 336 Mass. 139, 142, 142 N.E.2d 896,898. Accord City of Anchorage v. Nesbett (Alaska 1975),530 P.2d 1324, 1330; Gerberding v. Schnakenberg (1984), 216 Neb. 200, 204,343 N.W.2d 62, 65; Baynard v. Every Evening Printing Co. (1910),9 Del. Ch. 127, 77 A. 891; Williams v. Fears (1970), 248 Ark. 486,493, 452 S.W.2d 642, 646. Certain of the cases cited by DeVal expressly hold that mere continued use in the accustomed manner after the conveyance of the servient estate is insufficient, as a matter of law, to bring home to the new owner that the use is now claimed as a matter of right. See Gerberding, supra; Williams,supra. All of the cases hold that circumstances must combine to bring home to the new owner clear notice of a conversion from permissive use to a prescriptive right.
We agree with these cases to the extent that they hold that whether a use that continues after a conveyance is adverse or permissive remains a question of fact. Clearly there may be scenarios in which the previously licensed use is so inconsistent with the rights of, and disadvantageous to, the new owner that its continuation must be presumed to be adverse. However, in a case such as this one, where the use is one that remains mutually advantageous to both the user and the new owner, we hold that the fact of the conveyance alone is not enough to satisfy the user's burden of establishing adversity.
This analysis leads to the second core principle that stands in the way of Shell's argument: the necessity that the use, in order to be adverse, must be under a claim of right. Although Shell argues that use under a claim of right is not a separate element of an easement by prescription, and is satisfied by any use inconsistent with the rights of the owner, we disagree, at least in the context of a mutually advantageous use. As the Summit County Court of Appeals observed in Manos v. Dry Cleaners Dyers, Inc. (1952), 91 Ohio App. 361, 363-364, 108 N.E.2d 347,349:
 An essential element in the establishment of an easement by prescription * * * is proof that the use of the land was adverse or hostile to the real owner and under a claim of right. Without such proof, one cannot be said to possess or use as an owner. While it is difficult to put into words a definition of adverse user, it is probably safe to say that a use is not adverse if the use of another's land is accompanied with an express or implied recognition of the landowner's right to put an end to the use, or, as stated in 2 Tiffany on Real Property (2 Ed.), Section 519 (at p. 2042, "a user is adverse if not accompanied by any recognition, in express terms or by implication, of a right in the landowner to stop such user now or at some time in the future."
In sum, we hold that Shell's use of the shopping-center property, which the trial court found to be permissive at its inception, did not become adverse, as a matter of law, by virtue of the subsequent conveyance of the property. Rather, we hold that whether the continued use was permissive or adverse remained a question of fact, and that Shell bore the burden of proving by clear and convincing evidence that its use was adverse and without recognition of DeVal's right to terminate the use.
Finally, Shell argues that, even it this be the case, the evidence was still insufficient to support the trial court's decision because the testimony of DeVal's partners demonstrated that they lacked specific recollection or understanding of any particular agreement underlying the mutual use of the property. We hold, however, that their vagueness on this count was not dispositive. What is apparent from the record is that DeVal considered the cut-through as reciprocal in nature — a mutual benefit — and one that had been in existence since the prior ownership. The absence of any clearer understanding did not necessarily establish, by clear and convincing evidence, that the use was adverse. There was also testimony from which it could be inferred that Shell never used the property under a claim of right that even after the sale to DeVal both sides continued to operate as if one's use of the cut-through was subordinate to the other's rights as owner.
Accordingly, because we hold that the trial court did not err as a matter of law in finding that Shell had failed to prove that its use of the cut-through was adverse rather than permissive, Shell's first assignment of error is overruled.
 IV.
In its second assignment of error, Shell argues that, if it was not contrary to law, the trial court's conclusion that its use of the property was permissive was against the weight of the evidence. Under this assignment, Shell challenges specifically the evidence upon which the trial court based its conclusion that Bettman gave permission to Shell for the construction and use of the cut-through. Specifically, Shell argues that, at most, Bettman's testimony established that he may have given permission to Shell to level the two properties.
The problem with Shell's argument is that, as Bettman pointed out in his testimony, Shell did not need the Rouse Company's permission to bring the grade of its property up to the level of the shopping-center property. This being so, a reasonable inference from Bettman's testimony is that someone from Shell or representing Shell contacted Bettman for the purpose of securing the Rouse Company's permission for a usable cut-through — not just a leveling of the two properties. Although Shell argues that Bettman's testimony was too uncertain and too subject to the vagaries of memory to establish this fact, it is well settled that an appellate court will not disturb the trial court's findings in a civil case if they are supported by some competent, credible evidence. Faber v. Queen City Terminals, Inc. (1994), 93 Ohio App.3d 720,568 N.E.2d 698.
Shell argues also that the testimony of Walter R. Lundwall, a real estate manager for Shell from 1964 to 1989, established that Shell would never have accepted mere oral permission to use the land. According to Lundwall, it was the company's strict practi2ce to get a recorded easement before construction began. Lundwall's testimony, Shell argues, "strongly supports the conclusion that the conversation that former Judge Bettman dimly recalled speaking in 1967 was not with a Shell representative," and that the conversation "was not a conversation about permission but rather a different topic altogether."
A review of Lundwall's testimony, however, shows why the magistrate viewed it with obvious skepticism, particularly in light of the absence of any personal knowledge of the discussion Bettman purported to have with a company representative. The weight to be given Lundwall's testimony was a matter primarily for the trial court. See State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus.
Shell argues, finally, that the fact that DeVal refused permission or even to sell an easement across its property to a prospective Wendy's developer in 1973 concretely establishes that it was predisposed against any similar permissive use of its property. This, however, is one possible inference — the other is that, having permitted one use, DeVal was not prepared to permit another.
Pursuant to Pavey, supra, DeVal had only the burden of presenting some evidence of a permissive use. We hold that the testimony of Bettman tending to show that the use was permissive at its inception, followed by the testimony of Ragusa, Stein, and Devitt indicating that the use continued for the mutual benefit of both properties and was not accompanied by a claim of right, was sufficient to satisfy DeVal's burden of production. As we have noted, the ultimate burden of persuasion remained on Shell to demonstrate by clear and convincing evidence that the use was truly adverse. Based upon our review of the record, we cannot say that the decision of the trial court that Shell had failed in its burden was contrary to the weight of the evidence.
Shell's second and final assignment of error is, therefore, overruled.
 V.
In its cross-appeal, DeVal argues that the trial court erred by failing to consider whether any easement was terminated due to Shell's use of the shopping-center property to benefit additional property, and because of what DeVal claimed was the increased burden of additional traffic and trash upon its property. Because we have affirmed in Shell's appeal the determination of the trial court that there was no prescriptive easement, these issues have all been rendered moot. Therefore, DeVal's cross-appeal is dismissed.
The judgment of the trial court is affirmed.
Judgment affirmed in C-980783 and appeal dismissed inC-980809.
 DOAN, P.J., and HILDEBRANDT, J., concur.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Opinion.