OPINION

MATTHEWS, Senior Justice.
I. INTRODUCTION
In the doctrine of adverse possession there is a presumption that the use of a private drive across the property of another is permissive and does not give rise to an easement. But the presumption does not apply where a drive was not originally established by the other property’s owner for his or her own use. The main question here is whether this presumption applies to the facts of this case. We hold that it does because the drive at issue was constructed by the original subdivision developers for their own use.
II. FACTS AND PROCEEDINGS
A. The Subdivision And The Trail
Lots 4 through 40 of the North Shore Subdivision extend along the north shore of Blodgett Lake. The subdivision was approved by the Matanuska-Susitna Borough in 1966. The subdivision plat is attached as Appendix A to this opinion. A ridge created by a lateral moraine bisects most of the lots so that they slope steeply down to the lake to the south and to what was originally swampy ground to the north. All of the lots border a platted road on the north, North Shore Drive. The lots are not large for a rural subdivision. For example, lot 28, which is owned by appellants James Dault and Shala Dobson, extends along the lake shore for only some 88 feet, while the distance from the lake to North Shore Drive is about 210 feet.
When the lots in the subdivision were first offered for sale in the late 1960s North Shore Drive was not improved or readily passable. The developers first tried showing the lots by boat. Subsequently they bulldozed a trail along the ridge. The superior court found that the purpose of this trail was “so that prospective buyers could gain access to the property.” The trail does not .appear on the subdivision plat. But by the time lots were sold, the deeds to most lots referred to the *86 trail, reserving to the subdivision developers as grantors “an easement for right-of-way purposes twenty (20) feet in width and upon the North One-half (N 1/2) of said lot.” For reasons that are not explained, no reservation was made with respect to lot 28.
B. The Controversy
The trail is the source of controversy in this case. The appellee, Edward Shaw, is the owner of lots 33 and 34 of the North Shore Subdivision. Appellants Dault and Dobson (Dault) own lot 28. The controversy came to a head in 2009. Shaw had a house on lots 33 and 34 that was built by his predecessors in title, the Rices, more than 30 years earlier. By 2009 North Shore Drive had been improved for many years and was fully passable. But Shaw continued to use the trail as the access route to his house up to where it merged with North Shore Drive at lot 26. The trail thus crossed lots 27 through 32, including Dault’s lot 28. In 2009 the only lot with a dwelling between the point of merger at lot 26 and Shaw’s house was lot 32, where a cabin owned by Carol and Oliver Krein was located. The Kreins also used the trail as their means of access to North Shore Drive.
Dault purchased lot 28 in 2006. In 2009 in preparation for constructing a house on the lot, he built a driveway from his house site to North Shore Drive. The trail merged with this driveway so that access along the trail to the lots to the west was not blocked. Dault built a shed where the trail had been. Shaw’s house was not then occupied. When Shaw’s brother, Michael Shaw, discovered that a driveway was being constructed, he asked Dault about the project. Dault assured Michael that the new driveway would provide safer access to Shaw’s property, but Michael expressed concern over the lack of a Borough permit. During a subsequent conversation, Dault said that he did not believe that he needed a Borough permit. Michael had by then discovered the grantor easements on some of the lots, including his brother’s, and based on them, told Dault to remove the obstruction from the trail.
Subsequently, Edward Shaw’s attorney contacted Dault, demanding that the trail be restored based on “the actual grant of easement in [Dault’s] deed” and “the theory of prescriptive easement.” Dault responded, disputing both the existence of a granted easement and the factual basis for an easement by prescription. Shaw then filed the complaint in the present case.
C. Pleadings And Motions
Shaw filed the complaint on May 12, 2010. It alleged that Shaw acquired his lots from his mother’s personal representative in August of 2008, and that his mother, Alice Tauseher, acquired them from the Federal National Mortgage Association in 1988. The complaint alleged that there is a dwelling on the property, that access to the dwelling is “via an improved driveway running over and through a number of lots in the subdivision, including Lot 28” and that Shaw and his predecessors have utilized the driveway “openly, continuously, hostilely, and in an uninterrupted fashion for a period of time in excess of 10 years.” The complaint’s final allegation of fact was that Dault blocked the driveway and refused to reopen it. Shaw requested an injunction requiring Dault to reopen the driveway and a declaration that a prescriptive easement runs through Dault’s property “in accordance with the defined and historical usage by [Shaw] and his predeees-sors-in-inter est. ”
In his answer Dault admitted the existence of the trail, and his reconfiguration of it, but denied that the requirements for a prescriptive easement were satisfied. Dault also posed a number of affirmative defenses, including the availability of the public right of way bordering Shaw’s property, estoppel, laches, and failure to join indispensable parties — referring to other lot owners whose property is traversed by the trail.
After some discovery was conducted, Shaw moved for what he termed a “Declaratory Judgment.” This was understood by the parties and the court to be a motion for summary judgment. Shaw’s memorandum in support of his motion related the ownership history of lots 33 and 34, in relevant part as follows. The subdivision plat was recorded by Helen Clements on September 7,1966. On August 9, 1968, John and Ina Boss and *87 Louis and Mary Odsather (who other evidence established as the subdivision developers) deeded lots 33 and 34 to Herbert and Lalladge Rice. This deed was recorded on July 17, 1979. A trustee’s deed to a mortgage company was recorded February 11, 1988. Shaw’s memorandum noted that this presumably resulted from a foreclosure. In short order, the mortgage company conveyed the property to the Federal National Mortgage Association, which in turn sold it to Alice Tauseher by deed recorded October 14, 1988. Finally, as noted in the complaint, Tauseher’s estate conveyed the property to Shaw in a deed recorded April 22, 2008.
According to Shaw, Tauseher occupied the property from the time of her purchase in 1988 until her death on August 25, 2007, with the exception of a six-week period in 1999. Shaw claimed to have also occupied the property as his principal residence at times, including the six-week period in 1999 when Tauseher did not live there. The property was rented from March 2008 until November 2008. Since then it has been vacant and listed for sale. At all times since Tauseher’s initial purchase, the trail was the sole means of access to the house on the property.
Shaw’s argument as set out in the memorandum supporting his motion was that the ten-year prescriptive period was satisfied by Tauscher’s use of the trail from 1988 until her death in 2007, and for the additional year that it was used by renters. This use, Shaw argued, also served to satisfy the requirements of continuity and notoriety. As to the requirement of hostility, Shaw’s memorandum stated:
There is a fundamental presumption that the use of land by an alleged easement holder was permissive unless the claimant proves a distinct, positive assertion of a right hostile to the owner. However, the presumption does not arise if the roadway was not established by the owner of the servient estate for its own use but for many years was the means of passage to the dominant estate [citations omitted].
Shaw’s memorandum went on to explain his view of why the presumption of permissiveness does not apply to this case:
In this case, the driveway was evidently established by the owners of the house when the house was constructed in 1977_The records of the State Recorder show that the owners at that time were Louis and Mary Odsather and John and Ina ... Boss. There is no direct or circumstantial evidence that there was a structure on Defendant’s Lot 28 during the period of time Plaintiff claims that the prescriptive easement arose, or that Defendants or their predecessors in interest constructed the driveway for their own use.... [T]he driveway was the only means of passage utilized by Plaintiff and his mother to the dominant estate, Lots 33 and 34.
Dault opposed Shaw’s motion and filed a cross-motion for summary judgment. In support of his cross-motion, Dault presented multiple affidavits including affidavits from three long-time owners of lots in the subdivision who testified as to the circumstances surrounding the construction of the trail, and its intended uses.[1] Robert Dobson purchased lot 23 from the subdivision developers in 1968. In his affidavit, he stated that the developers created the trail to allow prospective buyers access to the property to facilitate sales, and that it was understood that the trail was only useable as a matter of convenience:
6. When a particular lot owner wanted to develop his property, and therefore needed the space occupied by the access trail on the ridge line, it was understood that the lot owner could “knock down” the ridge line, thereby removing the access trail in the process.
7. After lot development ended the trail on a particular lot, the idea was that anyone who had been using the access trail would be able to continue using the remaining parts of the access trail that still existed but would, if necessary or desired, construct their own driveway, leading from the public right of way, as the way to drive to their lot.
8. My neighbors have, over the years all understood this and agreed to this. Any *88 other understanding would have rendered many of the lots as unbuildable — no place to put improvements as the access trail occupied the only feasible place to put improvements.
9. The realtor, John Boss of Totem Realty, who I bought my lot from, told me that the access trail was for convenience and that the public right of way would be the long term way to access lots in the subdivision. This made the only sense because the lots would not be buildable if you couldn’t build where the access trail was located.
Goi’don Benedict testified in an affidavit that he had purchased lot 40 in 1970. Like Dobson, he testified that the developers put in the trail to help with lot sales. He stated that the trail was also a way to gain access to the ridge line in order to develop lots. He understood that the “ridge line trail was not intended to be a permanent road. If it were to remain in place, it would have destroyed the value of the lots as the area that was buildable would have been largely taken by the presence of the trail.” Benedict also testified that in approximately 1978 he began excavation work on his lot and also worked on lots 38 and 39. Essentially, he pushed dirt from the ridge line toward North Shore Drive, thereby “taking down the hill” and, in the process, obliterating the trail. He stated that around that time the Borough began to maintain North Shore Drive, including snow removal. Benedict also testified that in the 90s Alice Tauscher called him about some changes being made to the trail by another lot owner, Bill Moll. According to Benedict, Tauscher made no objection to the work, and Benedict had the impression that “she understood that when people wanted to develop their lots, that they could do so and the public right of way would then be used to travel to particular lots instead of using the access trail on the lot where the improvements were being made.”
Carol Krein testified by affidavit that she and her husband purchased lot 32 in 1969. Krein testified that the agent they dealt with told her with respect to the trail that everyone eventually would have to put in their own driveway down to North Shore Drive. Krein also testified that she had discussed the trail with Tauscher on one occasion, during a conversation regarding an electric meter for Tauscher’s house that was installed on the Krein property. According to Krein, Tauscher understood that
the access trail was for convenience and when people wanted to use their lots, where the access trail was located, they would then build their own driveways off of the public right of way. [Tauscher] understood that she was crossing our private property and Glenna’s (the next lot owner to the east) private property. We were good neighbors and let each other cross our private property on the access road. We were good neighbors and let her keep the electric meter on our lot.
According to Krein, “Tauscher did not object when various persons in the subdivision either eliminated or re-routed the access trail on their properties. Nor did we. We all understood the temporary and conditional nature of the access trail.”
Dault’s opposition to Shaw’s summary judgment motion was wide-ranging.[2] But his main point was that the element of hostility *89 is missing. He noted that the trail was constructed by the developers of the subdivision and therefore “[t]he presumption of consent should apply.” He summed up by stating, “the evidence presented by Defendants establishes that use of the access trail was by consent. Plaintiff had the burden on the issue of consent and offered no evidence that consent was absent.”
Shaw filed a reply to Dault’s opposition and cross-motion, claiming that the evidence was insufficient to show that Tauscher understood that her right to use the trail was temporary. Shaw filed his own affidavit stating that there was never a community understanding that the use of the trail would be temporary. Shaw’s argument continued to rely on the premise that the presumption that a use is permissive does not apply and asserted that the burden of proof was on Dault to show that Tauseher’s use was consensual. But Shaw did not contest the evidence presented by Dault that the trail was built by the subdivision developers, rather than, as Shaw had asserted in his opening memorandum, by the original owners of his house.
The superior court denied Shaw’s motion for declaratory judgment and Dault’s cross-motion for summary judgment. The court found that there were genuine issues of material fact that precluded summary judgment. Specifically, the court found that there were genuine issues as to whether the usage of the trail was permissive. The court noted that “[wjhether there was community understanding among the property owners that the use of the trail was permissive is a genuine issue of material fact.” In addition, the court found that there were genuine issues as to the continuity and duration of Tauseher’s use of the trail.
D. The Trial
The case proceeded to a bench trial which occupied parts of four days in March 2011. The evidence presented by Shaw relating to the continuity and duration of use of the trail by Tauscher was much the same as he had presented in affidavit form in his motion for declaratory judgment. But he did not present evidence that the trail was constructed by the original owners of his house.
The evidence presented by Dault was also similar to the evidence that he presented in his opposition to Shaw’s motion and in support of his cross-motion for summary judgment. In particular, the evidence was undisputed that the trail was built by the subdivision developers to aid them in selling the property and to facilitate development of the property. Robert Dobson testified:
When we bought ... the property ... they were glad to tell us that there was a trail that we could use to get up there ... they put it in so we could get up and see our lots and use our lots. And there was not any indication that that’s the way it was going to always be.” Carol Krein similarly testified that “there was a ... trail up along the ridge that was built to show all the property and our realtor took us over there and showed us the lots that were available.
Krein further testified: “[WJe were told when we bought it that that was a trail for the realtors and that eventually we would have to build our own driveway up from North [Sjhore....”[3]
E. The Superior Court’s Decision
The superior court issued its decision in a 27-page written order.[4] The court found by clear and convincing evidence that Shaw proved that he had a prescriptive easement where the trail crossed lot 28. The court found that the continuity and ten-year dura *90 tion elements of adverse possession were satisfied by Tauseher’s use from 1988 through 2007. With respect to hostility, the court concluded that the general presumption that the use of land by an alleged easement holder is permissive did not apply. Instead, the court applied a presumption that the use of the easement was hostile. The court wrote:
The Alaska Supreme Court set forth the applicable analysis relating to hostility in McDonald:
The hostility requirement, however, is “determined by application of an objective test which simply asks whether the possessor acted toward the land as if he owned it, without the permission of one with legal authority to give possession.” Still, we will presume that the use of land by an alleged easement holder was permissive unless a claimant proves “a distinct and positive assertion of a right hostile to the owner.” But this presumption does not arise if “a roadway was not established by the owner of the servient estate for its own use but was for many years the only means of passage to the dominant estate.” 978 P.2d at 84-85 (citations omitted). The Court relied primarily on McGill v. Wahl, 839 P.2d 393, 397-98 (Alaska 1992), in this respect, in which the Court held:
However, in this case it would be inappropriate for us to presume that the Wahls were acting as merely permitted users of the roadway. Such a presumption does not arise where a roadway was not established by the owner of the ser-vient estate for its own use but was for many years the only means of passage to the dominant estate. Richardson v. Brennan, 92 Nev. 236, 548 P.2d 1370, 1372 (1976).
Both of these cases involved an allegation of a prescriptive easement by a person whose driveway crossed the property of another person. The Court essentially held that in such cases, hostility is presumed and generally can only be rebutted by an affirmative act by the landowner of the subservient estate. As the Court explained in McGill:
The roadway originally was and continuously had been used as access to the lots ■ behind the McGills’ property. The roadway existed and was used by the Neis Wahls before the McGills came to the property. Although other lot owners now use Highway 1 to get to their lots, the use of the roadway has never changed with respect to lot 11. The McGills, having come to land burdened by the roadway, cannot now claim that the users of the roadway were acting merely with their permission. Likewise, the McGills without any affirmative action cannot now claim that they intended to permit the use of the road by the other landowners.

Id.

This case is virtually identical to McDonald and McGill. There is no dispute that Ms. Tauscher and plaintiff crossed lot 28 solely for the purpose of gaining access to their property. Defendants came to lot 28 well after that use began. And they took no affirmative action to block the access until 2009. Plaintiffs use therefore was hostile.
The superior court went on to state that even if there were no presumption of hostility, the coui’t would conclude that Tauscher’s use of the trail was hostile because there was no evidence that the owners of lot 28 did not acquiesce in Tauseher’s use of the trail, nor was there evidence that Tauscher, or Shaw, ever acknowledged that their use was subordinate to the owner’s title. The court wrote:
The court would reach the same conclusion even absent the presumption. In determining whether a use is hostile, the court must look to whether the owner of lot 28 gave his or her permission to use the trail or merely acquiesced in that use. In particular, as the Alaska Supreme Court explained in Tenala, Ltd. v. Fowler, 921 P.2d 1114,1120 (Alaska 1996):
In Swift v. Knijfen, 706 P.2d 296, 304 (Alaska 1985), we stated that “[t]he hostility element turns on the distinction between acquiescence and permission,” and held that if the true owners merely acquiesce, and do not intend to permit a use, the claimant’s use is adverse and *91 hostile. Therefore, we must decide whether the record reveals that Tenala intended to permit the Mayos’ use or merely acquiesced in that use. In Hubbard v. Curtiss, 684 P.2d 842 [(Alaska 1984) ], we stated that “[t]he key difference between acquiescence by the true owner and possession with the permission of the true owner is that a permissive use requires the acknowledgment by the possessor that he holds in subordination to the owner’s title.” Id. at 848 (citations omitted).
The evidence here supports a finding of acquiescence by clear and convincing evidence. First, and perhaps most important, there was absolutely no evidence that the original owner of lot 28 had any conversation whatsoever with Ms. Tauseher regarding her right to use the trail as her driveway to her lots. Nor is there any evidence that Ms. Tauseher or plaintiff ever acknowledged to that person that her use “was in subordination to” that owner’s title. There accordingly is no evidence to counter the claim by plaintiff and his brother that they always assumed they had the right to cross the property and that no one really eared whether they did so.
The court also found that the use of the trail was notorious, noting that it was undisputed that Tauseher had used the trail as her driveway and had done so openly and obviously. After rejecting Dault’s affirmative defense of laches and holding that other landowners did not have to be joined under Alaska Civil Rule 19, the court directed entry of judgment declaring that a prescriptive easement existed on the portion of the trail that crosses lot 28. The court also ordered Dault not to obstruct the easement and required him to remove the obstruction that was already present.
The court recognized some problems inherent in this resolution and encouraged the parties to consider settlement:
The court feels constrained to note, however, that while plaintiff has thereby won this battle, it is not at all clear that this is the best result long-term for any of the parties. Because the trail crosses defendants’ property in a manner that makes it very difficult to develop, plaintiffs use of the trail will create ongoing difficulties with his neighbor. It seems to the court that this is a matter that can and should have been resolved through settlement in a manner that assured plaintiff access and defendants full use of their land. The court encourages the parties to explore settlement in lieu of any further legal proceedings.
III. STANDARD OF REVIEW .
The question in this case is whether an evidentiary presumption was correctly applied. This is a question of law. We review such questions de novo.[5]
IV. DISCUSSION
On appeal Dault challenges the superior court’s findings concerning notoriety, continuity, and hostility. In addition, he argues that the court erred in failing to bar -Shaw’s claim on the grounds of laches, that the claim should have been dismissed for failure to join indispensable parties, and that the location, type, character, and scope of the easement ordered by the court were insufficiently defined. Because we conclude that the court erred with respect to hostility, we find it unnecessary to consider Dault’s other arguments.
The Superior Court Erred In Holding That The Element Of Hostility Was Satisfied.
The elements underlying a court-ordered prescriptive easement are similar to the elements for adverse possession of real property, except that adverse possession focuses on possession, which is ordinarily exclusive, whereas prescriptive easements focus on use, which is often non-exclusive.[6]
To be entitled to a prescriptive easement, a party must prove (1) continuity — that the use of the easement was continuous and uninterrupted; (2) hostility — that the user *92 acted as the owner and not merely one with the permission of the owner; and (3) notoriety — that the use was reasonably visible to the record owner. A claimant must prove each element by clear and convincing evidence. Finally a claimant must have engaged in the adverse use for at least ten years.[7]
Until amendments made in 2003, adverse possession was governed by two statutory sections. The first, AS 09.10.030, provided:
No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of action.
Although in form simply a statute of limitations, this section served as the basis for establishing new title through adverse possession.[8]
The other statutory section, AS 09.45.052, allowed claimants under color of title to establish title after the passage of seven years. Alaska Statute 09.45.052(a), prior to 2003, provided:
The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more is conclusively presumed to give title to the property except as against the state or the United States.
Since the use in question here began, according to Shaw, with Tauscher’s use in 1988 and was terminated when Dault blocked the trail in 2009, these statutes govern Shaw’s claim as to use of the trail until 2003.
The 2003 amendments substantially changed and restricted the law of adverse possession. Alaska Statute 09.10.030(a) and (b) now reads:
(a) Except as provided in (b) of this section, a person may not bring an action for the recovery of real property or for the recovery of the possession of it unless the action is commenced within TO years. An action may not be maintained under this subsection for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of the action.
(b) An action may be brought at any time by a person who was seized or possessed of the real property in question at some time before the commencement of the action or whose grantor or predecessor was seized or possessed of the real property in question at some time before commencement of the action, and whose ownership interest in the real property is recorded under AS 40.17, in order to
(1) quiet title to that real property; or
(2) eject a person from that real property-
Alaska Statute 09.45.052(a) now provides in relevant part:
The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more, or the uninteri’upted adverse notorious possession of real property for 10 years or more because of a good faith but mistaken belief that the real property lies within the boundaries of adjacent real property owned by the adverse claimant, is conclusively presumed to give title to the property except as against the state or the United States.
Under these amendments, adverse possession claims are limited to cases where the claimant either has “a good faith but mistaken belief that the real property lies within the boundaries of adjacent real property owned by the adverse claimant” or is asserting a claim under color of title.[9] The ten-year statute of limitations set out in AS 09.10.030(a) does not, because of the lan *93 guage of .030(b), bar a quiet title or ejectment action by a record owner.
If Shaw’s claim depended on a period of use after the 2003 effective date of the amended statutes, substantial questions would exist as to whether and how they should be applied to prescriptive easement claims.[10] But under the view that we take of this ease these questions do not arise because even under the pre-2003 statutes, Shaw’s claim fails.
Shaw’s claim fails because the presumption that the use of a drive across another’s property is permissive applies to this ease. The exception relied upon by the superior court applies only where the “roadway was not established by the owner of the servient estate for its own use.”[11] Here it was undisputed that the trail was established by the subdivision developers for their own use in marketing the lots and that the developers allowed lot buyers to use the trail for an indeterminate period. It would not make sense to presume that the use of a trail as intended by those who owned the land and built the trail was anything other than consensual. This result is explicitly confirmed by our case law, which establishes that the presumption of permissive use is reversed only when “the driveway existed when [the alleged servient estate owner] first bought the property and there is no indication that her ‘predecessors in title built or used the driveway.”[12]
*94 In order to overcome the presumption that the use of the trail was by permission, Shaw was required to provide “proof of a distinct and positive assertion of a right hostile to the owner.”[13] But there was no proof of a distinct and positive assertion of a right on the part of Tauseher against the owners of lot 28. Nor was there such an assertion on the part of Shaw, until this controversy arose in 2009. In fact, there is nothing indicating that Tauscher’s use of the trail as the drive to her house was any different than the use of the trail by the Rices, the original owners of lots 33 and 34.
Further, application of the presumption that a use is permissive is consistent with the undisputed facts of this case. The subdivision developers built the trail to facilitate sales and as lots were sold, granted permission to the new lot owners to use it. The duration of the grant of permission from the developers has not been determined.[14] But the crucial fact is that the initial use was by permission. A use that is initially permitted can become adverse only “by proof of a distinct and positive assertion of a right hostile to the owner of the property.”[15] Further, the distinct and positive assertion of a hostile right must take the form of conduct that would give the owner of the property notice of hostility and thus of the need to protect the owner’s interests.[16] A mere transfer of ownership does not suffice to convert a permitted use to a hostile use.[17] As the Idaho Supreme Court has noted:
To hold that permission granted automatically expires without some action of adverseness would be to require that the permission be regranted by the owner of the servient estate each time the dominant estate was transferred. Such a rule would impose too great a burden of inquiry as to property ownership upon servient estate holders.[18]
The effect of the presumption of permissive use in this case was that Shaw had the burden of going forward with evidence to rebut the presumption.[19] This burden required Shaw to introduce evidence sufficient to permit a reasonable conclusion that the use of the portion of the trail crossing lot 28 by the owners of lots 33 and 34 was hostile, rather than permissive, for a ten-year period.
The trial court appears to have concluded that acquiescence in the use of the *95 trail by the owners of lot 28 serves as evidence of hostility. But this conclusion was erroneous because owner acquiescence is not “a distinct and positive assertion of a right hostile to the owner.”[20] Moreover, the fact that one owner has acquiesced in a use is not at all inconsistent with the possibility that an earlier owner permitted it. The court’s use of acquiescence in this case changed the presumption of permission to a presumption of hostility and erroneously placed on Dault the burden of proving consent.[21]
In concluding that the court erred in finding that Shaw has a prescriptive easement to use the portion of the trail crossing lot 28, we are aware that this will mean that Shaw will have to build a driveway on his lots to North Shore Drive. In view of the steepness of the ridge this may entail considerable earthmov-ing efforts similar to, or perhaps more intensive than, those undertaken by the owners of other developed lots in the subdivision. This burden, however, does not justify imposition of an easement on lot 28. But the superior court on remand may consider the entry of an order that would permit Shaw to use the trail for a short period until he is able to build a driveway on his own property.[22]
V. CONCLUSION
For the reasons stated, the judgment of the superior court is REVERSED and this case is REMANDED with instructions to enter judgment in favor of the appellants in accordance with the views expressed in this opinion.

. The three affiants were Robert Dobson, Gordon Benedict, and Carol Krein.

. Dault filed an affidavit in which he explains that he and Shala Dobson own and live on another lot in the subdivision, lot 35, which is adjacent to and west of Shaw’s lots. Dault testified that preparatory to building a house there in 2004 he talked with Tauscher about bringing earthmov-ing equipment over the trail, since it is easier to "push down” than “push up.” According to Dault, Tauscher initially agreed, but "as it turned out,” he instead brought the equipment in from the public right of way and created a driveway to his house site by working up-slope. In the process he eliminated the trail on lot 35, just as development on lots 37-40 had eliminated it there. Why he did not bring equipment up over the trail was explained by Dault at trial. A few days after Tauscher agreed that Dault could bring equipment over the trail, Shaw told him that he could not.
In his affidavit, Dault also explained why the trail precludes lot development. The drop off from the ridge line is steep, so the ridge must be leveled to some extent by pushing material north toward North Shore Drive. In addition, there is a 75-foot offset requirement from the lake shore as to buildings and 100 feet as to septic systems. Finally, there are specific distances that must be satisfied between wells and septic systems. These factors mean that the ridge is the only plausible house site.

. This aspect of Krein’s testimony was objected to as hearsay, but the testimony was allowed on the grounds that it would serve as background for a conversation between Krein and Tauscher as to the temporary nature of the trail. The testimony was also admissible on the issue of the community understanding as to the nature of the trail. The court had ruled on summary judgment that this was a material issue in the case. Krein’s testimony was covered by Evidence Rule 803(20), which excludes from the hearsay rule evidence of reputation in the community arising before the controversy as to customs affecting lands in the community.

. The text of the court’s order relating to the issue of whether a prescriptive easement was established is set forth in Appendix B.

. In re Estate of Fields, 219 P.3d 995, 1002-03 (Alaska 2009).

. Tenala, Ltd. v. Fowler, 921 P.2d.lll4, 1119 (Alaska 1996).

. McDonald v. Harris, 978 P.2d 81, 83 (Alaska 1999) (emphasis and internal citations omitted).

. Cowan v. Yeisley, 255 P.3d 966, 973 n. 23 (Alaska 2011); Tenala, 921 P.2d at 1118.

.Cowan, 255 P.3d at 972-73; Hansen v. Davis, 220 P.3d 911, 915 n. 7 (Alaska 2009).

. See Minutes, House Jud. Comm., Hearing on S.B. 93, 23d Leg., 1st Sess. at 1428 (May 18, 2003) (testimony of Ronald Baird, real estate attorney) (suggesting amendments would extinguish "private prescriptive rights”).

. McGill v. Wahl, 839 P.2d 393, 397-98 (Alaska 1992); McDonald, 978 P.2d at 83.

. McDonald, 978 P.2d at 85 (emphasis added). Our discussion in Weidner v. State, Department of Transportation & Public Facilities, 860 P.2d 1205, 1210 (Alaska 1993) casts light on the logic underlying the presumption of permissive use and on the McGill/McDonald exception to the presumption. In Weidner the question was whether a road constructed by the State on private property should presumptively be regarded as having been constructed with the permission of the private landowner. We answered this question in the negative noting that the circumstances — constructing a permanent public road on private land — were inconsistent with permission on the part of the landowner. In reaching this conclusion we discussed Dillingham Commercial Co. v. City of Dillingham, 705 P.2d 410, 416-17 (Alaska 1985), which applied the presumption of permissive use in a prescriptive easement context, and McGill. Concerning Dill-ingham we noted that the public's use of land abutting an alley may have been allowed by the owner "to facilitate public access to the owners’ businesses_" Weidner at 1210. Comparing these two cases we stated:
The distinction between Dillingham and McGill lies in the concepts of “permission” and "claim of right.” Permission contemplates the servient landowner's right to revoke that permission and prevent further use of the servient owner’s land. A claim of right, on the other hand, contemplates uninterrupted future use of the property. In Dillingham, the public’s use of the land abutting the alleyway was consistent with the concept of permission. If the public merely used the land in order to gain access to the stores along the alleyway, such use did not contemplate unrestricted future access so much as permission to use the land as an incident to patronizing the stores. In McGill, on the other hand, the Wahls built and maintained a road across the McGills’ land as the sole access to the Wahls’ property. Since access is essential to the beneficial use of one’s land, a road providing the sole access to a parcel likely contemplates continued use not subject to the permission of another. Thus, the maintenance of a sole access, without more, gives notice of a claim of right, rather than use subject to permission.
This case is closer to McGill. In 1968, the State reconstructed the Bay Road. If a deviation was made, the State surely claimed that new portion as part of the land it had a right to use. The dedication of State resources to the construction and maintenance of a public roadway is not the type of land use which one would subject to the permission of a servient landowner. In constructing a road, the government makes a commitment that contemplates continued, unrestricted use of the affected land. In other words, once the State determines a roadway is needed for public access to a certain region, the State surely does not intend such access to be contingent upon the permission of a private landowner. Unlike Dillingham, the interests of the private landowner and the public are not sufficiently aligned for the public’s use to be presumptively permissive. Thus, construction and maintenance of a public roadway is a use that contemplates a claim of right rather than the owner’s permission. Id. at 1210-11 (emphasis added).
Here, to follow the highlighted portions of the Weidner discussion, the new lot owners’ uses of the trail were consistent with the concept of permission. If new lot owners used the trail to facilitate development of their lots and for access during a transitional period of subdivision devel *94 opment, such uses did not necessarily contemplate unrestricted future use of the trail but could be pursuant to an accommodation afforded by the subdivision developers to make the lots more attractive for sale. Thus, there was a plausible alignment of interests that was consistent with the concept of permission. Further, the trail was not the sole access to any of the lots, because a platted street that was initially undeveloped abutted every lot. Therefore, one could not say that continued use of the trail without permission was likely contemplated. Finally, since the developers built the trail for their own purposes, its continued use by lot owners did not involve a substantial commitment of resources that would be inconsistent with the eventual cessation of the use of the trail.

. McGill, 839 P.2d at 397 (internal quotation marks omitted).

. Also undetermined is the effect of the right-of-way reservation in favor of the grantor developers contained in most of the initial deeds, but not in the deed for lot 28. Dault contends that the deed language confirms the temporary nature of the easement, since the easement is reserved to the grantors and does not mention their "successors and assigns.” Shaw responds that "nothing in the plain language of these deeds referfs] to a 'temporary' easement.” Neither party makes a detailed argument, undoubtedly because the deed to lot 28 contains no such reservation. We express no view on this question.

. City of Anchorage v. Nesbett, 530 P.2d 1324, 1328-29 (Alaska 1975) (internal citation omitted).

. Id. at 1330 ("If permissive in its inception, then such permissive character being stamped on the use at the outset, will continue of the same nature, and no adverse user can arise until a distinct and positive assertion of a right to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature....” (quoting Scheller v. Pierce Cnty., 55 Wash. 298, 104 P. 277 (1909))); Hunter v. Shields, 131 Idaho 148, 953 P.2d 588, 592 (1998) ("Absent unequivocal conduct giving the owner of the property notice of hostility and adverseness, we will not conclude that a use initiated with permission has somehow changed to one of hostility.” (quoting Lorang v. Hunt, 107 Idaho 802, 693 P.2d 448, 450 (1984))).

. City of Anchorage, 530 P.2d at 1329.

. Hunter, 953 P.2d at 592.

. Alaska R. Evid. 301(a).

. City of Anchorage, 530 P.2d at 1328-29.

. This is evident from the court's language quoted supra on p. 14: "There accordingly is no evidence to counter the claim by plaintiff and his brother that they always assumed they had the right to cross the property and that no one really cared whether they did so.”

. The dissent argues that there was a dispute as to whether the developers of the subdivision were initially the owners of all the lots in the subdivision. We disagree. Robert Dobson testified at trial that the developers owned the entire subdivision. This echoed his affidavit submitted in opposition to Shaw's motion for summary judgment and in support of Dault's cross-motion for summary judgment, which in inclusive terms described the developers as the "developer-owners of the subdivision” "who purchased the lots from Helen Clements.” James Dault also testified in inclusive terms in his affidavit relating to the same motions that "Helen Clements sold the land to three couples who sold lots through the business known as Totem Realty. The lot owners then asked Gus Scheele to put in the trail.” Likewise in his trial brief concerning the issue of consent, Dault asserted without exception or qualification that "the realtor purchasers of the platted subdivision hired a local earth mover to construct a trail....” Shaw did not take issue with any of these assertions and at no point argued that the developers did not have an ownership interest in all the lots when they built the trail. Nor does he do so on appeal. Likewise the trial court never suggested that the subdivision developers who constructed the trail did not have an ownership interest in all the lots over which the trail passed. See the court's decision set out in Appendix B, especially pages 2 and 3 where the trial court refers to the builders of the trail as "the subdivision developer” and "the original developer.” Indeed the trial court's understanding of the situation seems well reflected by a question the court asked of Shaw’s counsel during final argument after all the evidence was presented. The court referred to “whoever it was who created the subdivision way back when” as the person who "put in a trail that rendered the lots fairly undevelopable if in fact that was going to be the right-of-way.”
The dissent also claims that the trial court made an implicit finding that the "realtor-developers did not own Lot 28 when they bulldozed the trail_" But there is nothing in the court’s opinion that implies such a finding. The dissent also refers to the trial court’s "express finding that there was no evidence the owner of Lot 28 said or did anything with respect to the trail bulldozed across Lot 28.” But the finding referred to relates to the absence of any conversation between the owner of lot 28 and Shaw's mother, Alice Tauscher. See Appendix B, page 9. Tauscher began to occupy her property in the subdivision in 1988, at least 20 years after the trail was constructed. The absence of any conversation with Tauscher in 1988 says nothing about whether the developers had an ownership interest in Lot 28 when the trail was constructed.